[Civ. No. 34107.   Second Dist., Div. One.   Dec. 11, 1969.]

CAPITOL RECORDS, INC., Plaintiff and Respondent, v.
RICHARD W. ERICKSON et al., Defendants and Appellants.

## COUNSEL

Beardsley, Hufstedler & Kemble, John Sobieski and Arthur Leeds for Defendants and Appellants.

Gang, Tyre & Brown, Martin Gang and Bruce M. Ramer for Plaintiff and Respondent.

## OPINION

**WOOD, P. J.**—Defendants (Phoenix, hereinafter) appeal from an order granting a preliminary injunction[1] restraining Phoenix, pending the hearing and determination of the action, from transferring to magnetic tape any

[1]An order granting a preliminary injunction is appealable. (See Code Civ. Proc., § 904.1, subd. (f); 3 Witkin, Cal. Procedure (1954) Appeal, § 22, p. 2165.)

performances embodied in phonographic recordings produced and sold by plaintiff recording company (Capitol, hereinafter).

Phoenix contends that the court erred in granting the injunction.

For the purposes of the preliminary injunction, there is no dispute as to the facts. Phoenix is admittedly in the business of selling prerecorded stereophonic tape cartridges, which it produces as follows: Phoenix purchases on the open market records and tapes of musical performances which have been produced, recorded, and sold by Capitol. Phoenix then makes "master" recordings from the records and tapes which it purchased, and uses the master recordings to produce tape cartridges which it sells to the general public.[2] On the front of each cartridge package Phoenix affixes a label which bears the title of the recorded performance and the names of the performing artists; and, on the back of the cartridge package, it affixes a label bearing the following words: "No relationship of any kind exists between Phoenix and the original recording company nor between this recording and the original recording artist. This tape is not produced under a license of any kind from the original company nor the recording artist(s) and neither the original recording company nor artist(s) receives a fee or royalty of any kind from Phoenix. Permission to produce this tape has not been sought nor obtained from any party whatsoever."

It is admitted that Phoenix does not seek or obtain permission of Capitol, or permission of the recording artists, to reproduce the records or tapes; and that Phoenix does not pay any fee or royalty to Capitol, or to the recording artist, or to the welfare and pension funds of the musicians' union. Phoenix does set aside a "Composers' Trust Account" to which Phoenix contributes two cents "per tune," and from which Phoenix pays the statutory two-cent royalty required to be paid to the copyright proprietor of the musical composition recorded on the tapes sold by Phoenix.

Some of the evidence[3] in support of the application for the preliminary injunction was in substance as follows:

For many years Capitol has been engaged in the manufacture and sale of records in which the performances of noted recording artists are embodied, and Capitol is a leading manufacturer of such records in the United States and has attained a worldwide reputation as a manufacturer of records of the highest artistic and technical quality. The records manufactured by

[2]According to Capitol, conduct whereby records are duplicated and sold commercially without permission of the record owner is referred to as "record piracy" in the recording industry. (See *Piracy on Records*, 5 Stan.L.Rev. 433.)

[3]It was stipulated that all affidavits and declarations on file in the action might be admitted in evidence at the hearing of the application for the preliminary injunction.

Capitol are in the form of discs and prerecorded magnetic tapes. The tapes are often sold in the form of tape cartridges, which have recently received substantial acceptance by the public for use in homes and automobiles. In the past ten years, the sales volume of tapes has increased substantially. Since 1965, Capitol has expended in excess of $10,000,000 in recording "master recordings," and has expended in excess of $35,000,000 to advertise and exploit its records. A master recording is the original recorded performance and it is used to manufacture the discs and tapes which are sold. Among other recordings, Capitol made master recordings of 11 performances by a vocal group known as "The Lettermen," and from those recordings Capitol produced an album entitled "Goin' Out of My Head." The Lettermen granted to Capitol the sole and exclusive right to manufacture and sell records embodying the performances by The Lettermen, and the sole and exclusive right to use the name "Lettermen" in connection with the sale of such records. The cost of producing said album, exclusive of costs for studio time, engineers, and materials, was $25,000. The album was distributed for sale in March 1968 and, as of July 1968, Capitol had derived $500,000 gross receipts from sales of the album. A weekly publication entitled "Cash Box" is a leading publication in the recording industry. It publishes a weekly survey of record sales in the form of a chart entitled "Top 100 Albums," that lists the albums which, according to statistics, are currently the best selling albums. The chart lists, for each album, the name of the performing artist, the title of the performance, and the name of the manufacturer. Commencing in May 1968 the album "Goin' Out of My Head" appeared on the chart for 16 weeks, and it was in fourteenth position on the chart at its "highest point." Said album also appeared on the "Top 20 LP's" chart of "Billboard," another publication in the recording industry. From one of Capitol's albums of "Goin' Out of My Head," Phoenix produced tape cartridges which bore the title "Goin' Out of My Head," and the name of the recording artists, "The Lettermen." Said cartridges also bore the aforementioned label to the effect that there was no relationship between Phoenix and the original recording company, etc. Phoenix circulated advertisements to wholesale and retail dealers offering to sell tape cartridges of such album and other albums on Billboard's "Top 20 LP's." In May 1968 a representative (Mr. Hamlin) of Phoenix contacted a national distributor of tape cartridges for automobiles and told said distributor that Phoenix was in the business of duplicating records and tape cartridges manufactured by other manufacturers and that Phoenix would sell the duplicated product for less than the price charged by the original manufacturers. Mr. Hamlin offered to sell tape cartridges of "Goin' Out of My Head" by "The Lettermen" at a substantial discount. The distributor recognized the "title" as that of a successful album manufactured by

Capitol; and Mr. Hamlin said that it was the intention of Phoenix "to test the law" and that it would be helpful if a national distributor handled the products of Phoenix. The distributor refused to purchase any of the tape cartridges because he desired to acquire "only such product as had been legitimately manufactured and paid for" and which could be acquired "through the normal and customary channels of trade." The distributor stated that the only reason he would consider purchasing Phoenix tape cartridges was his fear that the "pirated tape cartridges" offered by Phoenix might be sold to his competitors at prices substantially under the prices which he would pay for the "legitimate product."

There was also some evidence to the effect that on its tape cartridges of the Lettermen album Phoenix altered the order of the 11 performances of The Lettermen which comprised the album as produced and sold by Capitol;[4] and that (in opinion of a recording engineer) the quality of the Phoenix tapes was "dubbed off" (reproduced) from a record sold commercially, and the cartridges were of inferior quality, technically and audibly, and were not of the standard of quality maintained by Capitol, which maintains one of the highest technical standards in the recording industry.

Appellant contends that the court erred in granting the preliminary injunction. It argues in effect that its conduct in duplicating recordings produced by Capitol, without permission of Capitol or the recording artists, and then selling the duplicated recordings in competition with Capitol, is condoned by the decisions in *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784], and *Compco Corp.* v. *Day-Brite Lighting, Inc.,* 376 U.S. 234 [11 L.Ed.2d 669, 84 S.Ct. 779]; and that a state court cannot, on the theory of unfair competition or otherwise, enjoin such conduct.

In the *Sears* case, Sears manufactured a pole lamp which was "a substantially exact copy" of a pole lamp manufactured by Stiffel, and Sears sold its pole lamps at a price lower than the price for which the Stiffel lamps were sold. Stiffel's lamp was not patentable under federal law. The trial court found that there was some confusion by the public as to the source of the lamps, and found that Sears was guilty of unfair competition. (To establish a case of unfair competition under Illinois law, it was necessary to prove that there was "palming off"—"likelihood of confusion as to the source of the products.") The Supreme Court stated (pp. 230-231 [11 L.Ed.2d at pp. 666-667]) that "the patent system is one in which uniform federal standards are carefully used to promote invention while at the same

---

[4]No alterations were made in the performances as such, or in the title of the album, or in the name of the performers.

time preserving free competition," and that a state "could not extend . . . the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents." It was also said (pp. 231-232 [11 L.Ed.2d at p. 667]: "An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so. What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel. This it had every right to do under the federal patent laws. That Stiffel originated the pole lamp and made it popular is immaterial. 'Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested.' [Citation.] To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public. The result would be that while federal law grants only 14 or 17 years' protection to genuine inventions [citation], States could allow perpetual protection to articles too lacking in novelty to merit any patent at all under federal constitutional standards. This would be too great an encroachment on the federal patent system to be tolerated." The judgment (restraining Sears from selling its lamps) was reversed.

In the *Compco* case (decided on the same day as the *Sears* case), Compco manufactured a fluorescent lighting fixture which was substantially identical to a fixture manufactured by Day-Brite. Day-Brite's fixture was not patentable under federal law. The trial court found that there was confusion as to the source of the fixtures (Illinois law) and that Compco was guilty of unfair competition. The Supreme Court held that the order (restraining Compco from selling its fixtures, etc.) was "in conflict with the federal patent laws." It was also said (p. 238 [11 L.Ed.2d at p. 672]): "As we have said in Sears, while the federal patent laws prevent a State from prohibiting the copying and selling of unpatented articles, they do not stand in the way of state law, statutory or decisional, which requires those who make and sell copies to take precautions to identify their products as their own. A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original."

The opinion in the *Sears* case, and the opinion in the *Compco* case, made no reference to a prior decision of the Supreme Court in *International*

*News Service* v. *Associated Press,* 248 U.S. 215 [63 L.Ed. 211, 39 S.Ct. 68, 2 A.L.R. 293].[5] In the *International News* case, International and Associated were engaged in the "keenest competition" in gathering news. Associated, which gathered news at substantial expense for the benefit of its members, sought an injunction restraining International from "pirating" news gathered by Associated. International argued in effect that Associated's news was not copyrightable and that when Associated distributed (published) such news, it was in the public domain and could be used for any purpose, including use by International in selling it in competition with Associated. In affirming the decision of the Court of Appeals (which directed the district court to issue an injunction restraining International from taking the words or substance of Associated's news until its commercial value as news had passed away), the Supreme Court said (pp. 239-240 [63 L.Ed. at p. 221]): "The fault in the reasoning [of International] lies in applying as a test the right of the complainant [Associated] as against the public, instead of considering the rights of complainant and defendant, competitors in business, as between themselves. The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant,—which is what defendant has done and seeks to justify,—is a very different matter. In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money and which is salable by complainant for money, and that defendant, in appropriating it and selling it as its own, is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not, with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business." It was also said (p. 241) [63 L.Ed. at p. 221]): "It is to be observed that the view we adopt does not result in giving to complainant the right to monopolize either the gathering or the distribution of the news; or, without complying with the Copyright Act, to prevent the reproduction of its news articles; but only postpones participation by complainant's competitor in the processes of distribution and reproduction of news that it has not gathered, and only

---

[5]See Golstein, *Copyright,* 69 Colum.L.Rev. 49, 71, wherein it is said that the Supreme Court, in the *Sears* and *Compco* cases, did not repudiate the *International News* case.

to the extent necessary to prevent that competitor from reaping the fruits of complainant's efforts and expenditure, to the partial exclusion of complainant, and in violation of the principle that underlies the maxim 'sic utere tuo,' etc."

In *Pottstown Daily News Publishing Co. v. Pottstown Broadcasting Co.* (1963) 411 Pa. 383 [192 A.2d 657], plaintiff newspaper was granted an injunction restraining defendant radio broadcaster from appropriating news gathered by plaintiff. The court said (p. 663): "Competition in business is jealously protected by the law and the law abhors that which tends to diminish or stifle competition. While a competitor may, subject to the patent, copyright and trademark laws, initiate his rival's business practices, processes and methods, yet the protection which the law affords to competition does not and should not countenance the usurpation of a competitor's investment and toil. . . . [I]nsofar as the News Company pleads that the Broadcasting Company has 'pirated' news items gathered through the special services of the News Company, such states a violation of a property right and a claim of unfair competition which the state courts have jurisdiction to determine." The court also noted (p. 662) that unfair competition originally related to the "palming off" of one's goods as those of a competitor, and said (quoting from *A. L. A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 531-532 [79 L.Ed. 1570, 1580-1581, 55 S.Ct. 837]): "In recent years, its scope has been extended. It has been held to apply to *misappropriation* as well as *misrepresentation.*"

In *Capitol Records v. Mercury Records Corp.* (221 F.2d 657), decided prior to the decisions in *Sears* and *Compco,* Capitol obtained the right, from a German company, to manufacture and distribute in the United States records of performances by certain "highly gifted artists." The court stated that the federal copyright act does not extend protection to phonograph records of performances of public domain compositions by virtuosos (see *RCA Mfg. Co. v. Whiteman,* 114 F.2d 86, 89), and that New York law applied. The court determined that applicable New York law was in the decision in *Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp.,* 199 Misc. 786 [101 N.Y.S.2d 483], wherein Columbia Records, which had the exclusive right to sell (and had sold) records of certain operas, was granted an injunction to restrain unfair competition by the defendant, which had recorded the performances from broadcasts, and sold the records. The judgment in favor of Capitol was affirmed. (For a discussion of the aforementioned cases, see *Piracy on Records,* 5 Stan. L. Rev. 433, 443 et seq.; Golstein, *Copyright,* 69 Colum.L.Rev. 49 et seq.)

After the decisions in the *Sears* and *Compco* cases, several courts (state and federal) granted injunctive relief on the ground that misappropriation of unpatentable or uncopyrightable property by a competitor constituted

unfair competition. (See e.g., *Flexitized Inc. v. National Flexitized Corp.*, 335 F.2d 774, 781, cert. denied 380 U.S. 913 [13 L.Ed.2d 799, 85 S.Ct. 899]; *Capitol Records, Inc.* v. *Greatest Records, Inc.*, 43 Misc. 878 [252 N.Y.S.2d 553]; *Columbia Broadcasting System, Inc.* v. *Documentaries Unlimited, Inc.*, 42 Misc. 723, 726 [248 N.Y.S.2d 809]; *Flamingo Telefilm Sales, Inc.* v. *United Artists Corp.*, 141 U.S.P.Q. 461 [reversed on other grounds, 22 App.Div.2d 778 [254 N.Y.S.2d 36]].) A commentator (Golstein, *Copyright, supra*, p. 72) in discussing those cases in relation to *Sears* and *Compco*, said: "State courts and lower federal courts, sitting in diversity jurisdiction, have, not unexpectedly, relied upon the misappropriation-common law copyright nexus as a facile means for escaping the broad dictates of *Sears* and *Compco*. Specifically, lower court decisions have read the cases as prohibiting state injunctions against copying but not against appropriations—the distinction being between the duplication of one's work by another—copying—and 'the use of the identical product for the profits of another'—misappropriation. Thus, for example, where the defendant, without authority, dubbed plaintiff's recorded performance, the fact that the copying of a phonograph record was involved was deemed immaterial; after referring to *Sears* and *Compco*, the court concluded that the 'only issue presented hereon is whether defendants may *appropriate the performance* contained on plaintiff's phonograph records. In another post-*Sears* and *Compco* case, which involved the unauthorized recording of an announcer's newscast, the court, after determining that a 'broadcaster's voice and style of talking is, to all intents and purposes, his . . . property,' held that 'What was here done was not the copying of some article or goods made and sold by another but rather the appropriation of the very product itself, taking in effect the original and incorporating it in the record.'"

In *Capitol Records, Inc.* v. *Greatest Records, Inc., supra*, 43 Misc. 878 [252 N.Y.S.2d 553, 555-556]), it was said: "It is undisputed that prior to the *Sears, Roebuck* and *Compco* cases, *supra*, the law of this State protected the plaintiff from unauthorized reproduction of performances embodied on a master recording, basing such protection upon the doctrines of unfair competition, common law copyright or unlawful interference with contract. [Citations.] *Sears, Roebuck & Co.* v. *Stiffel Co., supra*, dealt with the sale to the public by defendant of a lamp which was 'substantially identical' (376 U.S. 225, 226, 84 S.Ct. 784) to that produced by plaintiff. *Compco Corp.* v. *Day-Brite Lighting, supra*, dealt with the sale of an *imitation* of plaintiff's lighting fixture which allegedly was distinctive in design. Neither of those learned decisions stands for the proposition that this plaintiff is not entitled to protection against the unauthorized appropriation, reproduction or duplication of the actual performances contained in its records." It was also said (p. 556), quoting from the opinion in *Columbia Broadcasting System, Inc.* v. *Documentaries Unlimited, Inc.*,

*supra,* p. 812: "In these unfair competition 'copying' cases [*Sears, Roebuck* and *Compco* cases] the Supreme Court held that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy the article. But it was pointed out that *state law, statutory or decisional, may in appropriate circumstances grant relief where deceptive or fraudulent practices are shown,* such as in palming off one's goods as those of another . . . . It is equally clear that the right of an author or proprietor of an unpublished work to common law protection and the application of state law of unfair competition in that field *remains unaffected by these decisions* or the principles set forth in these opinions. . . . [T]he well-settled rule is that *public performance of a work, such as . . . singing of a song, . . .* whether given in public or over the radio or television, *is not such a general publication as constitutes a dedication to the public or places it in the public domain* with consequent loss of copyright [citing cases] . . . . Actually, what was here done was not the copying of some article or goods made and sold by another but rather *the appropriation* of the very product itself . . . (emphasis added)."

In another case (*Grove Press, Inc.* v. *Collectors Publication, Inc.,* 264 F. Supp. 603) decided after the *Sears* and *Compco* cases, defendant reproduced, by photocopy and offset-lithography, a book published by plaintiff, and sold the reproductions in competition with plaintiff. The book was in the public domain (plaintiff acquired the right to publish it from a German company). The court granted a preliminary injunction restraining defendant from publishing the reproduced copies and said (p. 606): "The words in an uncopyrightable book are in the public domain and may be copied by anyone without infringing any copyright. Such copying, alone, does not constitute unfair competition. *Sears, Roebuck & Co.* v. *Stiffel,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp.* v. *Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). . . Unfair appropriation of the property of a competitor is unfair competition and redressable in a situation of this kind despite the holdings in *Sears, Roebuck & Co.* v. *Stiffel, supra,* and *Compco Corp.* v. *Day-Brite Lighting, Inc., supra. Greater Recording Co.* v. *Stambler,* 144 U.S.P.Q. 547 (N.Y. Sup. Ct. 1965); *Flamingo Telefilm Sales, Inc.* v. *United Artists Corp.,* 141 U.S.P.Q. 461 (N.Y. Sup. Ct. 1964), rev'd on other grounds, 22 A.D.2d 778, 254 N.Y.S.2d 36 (1964); cf *Cable Vision, Inc.* v. *KUTV, Inc.,* 335 F.2d 348, 351 (9th Cir. 1964). Defendants' first edition is more than mere copying of Plaintiff's work, the Grove edition. In view of Plaintiff's expenditure of substantial sums in setting type and engraving plates, it would constitute unfair competition for Defendants to appropriate the value and benefit of such expenditure to themselves by photographing and reproducing Plaintiff's book through the offset-lithography process, thereby cutting their own costs and obtaining an unfair

competitive advantage. See *International News Service* v. *Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918)."

In *Bond Buyer* v. *Dealers Digest Publishing Co.,* 25 App.Div.2d 158 [267 N.Y.S.2d 944], decided in 1966 (after decisions in *Sears* and *Compco*), plaintiff was engaged in the business of gathering information regarding municipal bonds and disseminating that information to its subscribers by means of a newsletter and a wire service. Defendant, a competitor of plaintiff, appropriated information from the wire service. The court granted an injunction enjoining defendant from using such information, and said (p. 945): "It is now no longer subject to question that there is a property in the gathering of news which may not be pirated (*International News Service* v. *Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211)."

In California, section 3369, subdivison 3, of the Civil Code provides that unfair competition "shall mean and include *unlawful,* unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive." (The amendment of that section in 1963 included the addition of the word "unlawful.") In *McCord Co.* v. *Plotnick* (1951) 108 Cal.App.2d 392, 395 [239 P.2d 32], it was said that "in an action for injunctive relief against unfair competition it is unnecessary to prove that defendant's conduct was fraudulent since Civil Code, section 3369, declares that unfair competition shall 'include unfair *or* fraudulent business practices.'" In that case, plaintiff sought to enjoin defendant (a competitor) from appropriating to defendant's use credit information gathered by plaintiff. The court quoted extensively from the opinion in *International News Service* v. *Associated Press, supra,* to the effect that a court of equity will enjoin the misappropriation for profit of news gathered by a competitor at substantial cost, and affirmed the judgment against defendant. (See *Hesse* v. *Grossman,* 152 Cal.App.2d 536, 541-542 [313 P.2d 625]; 47 Cal.Jur.2d, Trademarks, etc., § 33, p. 759, wherein it is said: "Unfair appropriation of the valuable efforts of another may be unfair competition. Thus, piracy of news acquired by another fairly and at substantial cost is actionable.")[6]

---

[6]In *Piracy on Records, supra,* 5 Stan.L.Rev. 433, 450-451, it is said: "Unfair competition as we know it today is the product of this century. Historically, it is rooted in the law of trade marks, trade names and deceit. But it has outgrown them with the development of more complex business relationships and corresponding malpractices. The modern unfair-competition case often presents a very complicated factual picture. Opinions of the courts frequently do not distinguish among the various practices commonly labeled unfair competition: palming off, wrongful injury (without misrepresentation) to another's established reputation and good will, and *misappropriation of the products of another's expenditure and good will.*" (Italics added.)

It is to be noted further that in 1968 the California Legislature enacted section 653h of the Penal Code, which provides in part as follows: "(a) Every person is guilty of a misdemeanor who: (1) Knowingly and willfully transfers or causes to be transferred any sounds recorded on a phonograph record, disc, wire, tape, film or other article on which sounds are recorded, with intent to sell or cause to be sold, or to use or cause to be used for profit through public performance, such article on which such sounds are so transferred, without the consent of the owner." Thus, the Legislature has in effect provided that "record piracy" is a misdemeanor.

■ In the present case, as above shown, Capitol expends substantial effort, skill and money in selecting performing artists and obtaining the exclusive right to record their performances, in mechanically reproducing their performances on discs and tapes of the highest quality, and in promoting the sale of the tapes and discs. Phoenix acquires the finished tapes and discs at nominal retail cost, reproduces them on inferior tape cartridges at little cost, labels the cartridges with the same title and the same name of the performing artists as appear on the Capitol recordings, and sells the cartridges in competition with, and at a substantially lower price than, the discs and tapes sold by Capitol. It is obvious that Phoenix is able to sell the cartridges at such lower price, and still gain substantial profit, because Phoenix circumvents the necessity of expending skill and money in acquiring the artists and recording their performances. Thus, Phoenix unfairly appropriates artistic performances produced by Capitol's efforts, and Phoenix profits thereby to the disadvantage of Capitol. Such conduct by Phoenix is unfair competition within the rulings in several of the above-cited cases. Moreover, although Phoenix applies a label on the back of its cartridges in effect disclaiming any connection with Capitol or the performing artists, such disclaimer of itself does not negate "palming off" or confusing the public as to the source of the recorded performances—the front of Phoenix's cartridges bears the same title (i.e., "Goin' Out of My Head") and the names of the same performing artists (i.e., "The Letter-men") as appear on the discs and tapes sold by Capitol and as appear in leading publications in the recording industry as having been produced by Capitol. Thus, there is a question of fact for the court at the trial regarding a permanent injunction as to whether Phoenix's conduct constituted "palming off " or confusion of the public as to the source of the recorded performances.

Phoenix's argument that the state court cannot restrain such unfair competiton is not sustainable. Under some of the above-cited cases, state law, statutory or decisional, may in some circumstances grant relief where deceptive or fraudulent competitive practices are conducted, such as circumstances where one palms off his products as those of his competitor,

or where he unfairly appropriates to his profit the valuable efforts of his competitor. Phoenix applies as a test the right of Capitol as against the public, instead of considering as a test the rights of Phoenix and Capitol, competitors in business, as between themselves. Phoenix has not merely copied or imitated discs or tapes produced by Capitol, rather, Phoenix has appropriated the product itself—performances embodied on the records. In addition, Phoenix had appropriated the titles of the performances (see *Gordon* v. *Warner Bros. Pictures, Inc.,* 269 Cal.App.2d 31, 36, 38-40 [74 Cal.Rptr. 499]; *Jubilee Industries, Inc.* v. *Roulette Records,* 153 U.S.P.Q. 431), and has appropriated the name of the recording artists (see *Fairfield* v. *American Photocopy etc. Co.,* 138 Cal.App.2d 82, 86 [291 P.2d 194]). It is reasonable to conclude that permitting such appropriation would discourage invention and free competition—and that those engaged in the recording industry would be inclined not to utilize their skill and efforts, and expend large amounts of money, in producing unique recordings, but would wait for a recording to be produced, and then duplicate it and sell it, at maximum profit and with minimum effort and expense. The trial court herein did not err in granting the preliminary injunction.

The order (granting preliminary injunction) is affirmed.

Lillie, J., and Thompson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 5, 1970.