19430

COLUMBIA BROADCASTING SYSTEM, INC., Appellant, v. CUSTOM RECORDING COMPANY, Inc., et al., Respondents

(189 S. E. (2d) 305)

466

*Messrs. Lybrand, Rich & Cain,* and *James E. Austin,* of Aiken, and *McKay, Sherrill, Walker, Townsend & Wilkins,* of Columbia, *for Appellant,*

*Messrs. Toole & Toole,* of Aiken, *Bryant, Fanning & Yarborough,* of Orangeburg, *Levine, Goodman & Murchison,* and *Richards & Shefte,* of Charlotte, N. C., *for Respondents.*

May 29, 1972.

LITTLEJOHN, Justice.

Columbia Broadcasting System, Inc., ("CBS") sought to enjoin defendants' "pirating" or appropriating performances embodied in phonograph recordings manufactured by its Columbia Records Division. In the recording industry this practice is known as ("disklegging"). The lower court declined to grant a temporary injunction and CBS has appealed.

CBS, in its complaint filed in the Court of Common Pleas for Aiken County in May, 1971, alleged that: CBS has for many years been engaged in the manufacture and sale of phonographic recordings in the form of disks and magnetic tapes. In the course of its business CBS has entered into contracts with various well-known performing artists and groups who have granted to CBS the exclusive right to manufacture, reproduce, and sell phonographic recordings embodying their performances. Under these contracts CBS has also been granted the sole and exclusive ownership of such performances so rendered and embodied in phonographic recordings, and the sole and exclusive right to use the name and likeness of these artists in connection with the sale and commercialization of such recordings.

Contracts have also been entered into by CBS with the American Federation of Television and Radio Artists and the American Federation of Musicians. Upon the sale of its recordings, CBS becomes liable to pay fees to designated trustees for the benefit of performing artists and musicians, and also becomes liable to pay specified royalties to the artists whose performances are embodied therein.

CBS has purchased or otherwise acquired costly, specialized machinery and equipment and has employed and compensated highly skilled personnel for the purpose of recording such performances and reproducing such recordings. These recordings are manufactured to conform to the highest musical and technical standards, utilizing equipment and procedures which have been developed and perfected at great expense. The recordings, and the names of the performers

themselves, are advertised and promoted at great expense to CBS. Through such expenditures and other promotional activities, CBS has built substantial public acceptance of these performances and recordings, and has established much good will.

The above allegations are neither admitted nor denied by defendants in their answer.

CBS's complaint contains further allegations which are specifically denied by defendants: It is alleged that CBS-manufactured recordings are acquired by defendants and are then re-recorded onto magnetic tapes which defendants, using the names of the original artists, then sell in competition with CBS. According to CBS, the quality of defendant's reproductions is inferior to CBS's original recordings. By so reproducing CBS's recordings, CBS alleges, defendants are able to avoid a great many of the legitimate expenses which CBS incurs. Such activity, CBS says, amounts to unfair competition, unlawful appropriation, unjust enrichment, wrongful deception of the public and unlawful trading on CBS's good will and public acceptance. CBS finally asserts that the inferior quality of defendants' tapes directly and adversely reflects upon CBS's products, that CBS has suffered extensive damages through lost sales and profits, and that CBS will continue to suffer irreparable injuries unless and until defendants' wrongful conduct is enjoined and restrained. A temporary injunction, a permanent injunction, an accounting, damages, etc., are asked in the prayer for relief.

By order dated May 17, 1971, defendants were commanded to show cause why a temporary injunction *pendente lite* should not be issued. By way of answer and response to this order, defendant Custom Recording Company, Inc. states that it purchases phonograph records on the open market, copies or duplicates selected performances therefrom onto magnetic tape, and thereby produces reproductions of the highest fidelity and quality. Such tape is then wound and spliced onto cartridges which are packaged in defendants' distinctive trade dress. Each such tape cartridge contains from

eleven to sixteen separate musical performances, usually performed by several different artists or groups of artists.

Defendants' answer set up several defenses. First, they allege that all common law rights attaching to phonograph records or electrical transcriptions have been abolished by statute [1] in South Carolina and that plaintiff is thereby barred from asserting any common law rights to collect royalties or further restrict defendants' commercial use of plaintiff's recordings.

As an additional defense the defendants allege that when phonograph records are sold by CBS on the open market, the records and the musical performances embodied thereon are thereby consigned to the public domain. CBS's assertion of the right to prevent others from copying such records, defendants allege, improperly interferes with the federal monopoly scheme. Accordingly, they say, CBS is barred from asserting such right.

As a further defense it is alleged that each CBS-manufactured tape or disk embodies a large number of different musical compositions. In selecting the performances to be reproduced onto their tapes and disks CBS deliberately combines musical performances which are known to be popular with performances of unknown popularity and performances known to be unpopular. Thus, defendants say, sale of the popular performances is conditioned upon purchase of the

---

[1] S. C. Code Ann. (1962), § 66-101 reads:
"Restriction of use.—When any phonograph record or electrical transcription, upon which musical performances are embodied, is sold in commerce for use within this State, all asserted common-law rights further to restrict or collect royalties on the commercial use made of any such recorded performances by any person are abrogated and expressly repealed. When such article or chattel has been sold in commerce any asserted intangible rights shall be deemed to have passed to the purchaser upon the purchase of the chattel itself and the right to further restrict the use made of phonograph records or electrical transcriptions, whose sole value is in their use, is forbidden and abrogated. Nothing in this section shall be deemed to deny the rights granted any person by the United States copyright laws. The sole intendment of this section is to abolish any common-law rights attaching to phonograph records and electrical transcriptions, whose sole value is in their use, and to forbid further restrictions or the collection of subsequent fees and royalties on phonograph records and electrical transcriptions by performers who were paid for the initial performance at the recording thereof."

other performances. They contend that this activity, when combined with an asserted exclusive right to control the manufacture and sale of such recordings, is illegal, inequitable, in restraint of trade, and repugnant to public policy.

Defendants prayed for dismissal of the action.

Both plaintiff and defendants submitted affidavits in support of their respective positions.

Plaintiff's request for a temporary injunction was heard on May 29, 1971, by the Honorable J. B. Ness. By order dated September 25, 1971, Judge Ness refused to grant the temporary injunction. Plaintiff has appealed.

The court, in its discretion, *County Council of Charleston v. Felkel,* 244 S. C. 480, 137 S. E. (2d) 577 (1964), may grant a temporary injunction "when it shall appear: (1) By the complaint, that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act the commission or continuance of which, during the litigation would produce injury to the plaintiff." Code of Laws of South Carolina (1962) § 10-2055.

The two conditions essential to the granting of a temporary injunction were reiterated by this Court in *Transcontinental Gas Pipe Line Corp. v. Porter,* 252 S. C. 478, 167 S. E. (2d) 313 (1969):

"First, the complaint must allege facts which appear to be sufficient to constitute a cause of action for injunction; and, second, on the entire showing from both sides it must appear, in view of all the circumstances, that the injunction is reasonably necessary to protect the legal rights of the plaintiff pending the litigation." [Quoting *Childs v. City of Columbia,* 87 S. C. 566, 70 S. E. 296 (1911) ].

It was also pointed out in that case that:

"When a *prima facie* showing has been made entitling plaintiff to injunctive relief, a temporary injunction will be granted without regard to the ultimate termination of the

case on the merits." [Citing *D. W. Alderman & Sons Co. v. Wilson*, 69 S. C. 156, 48 S. E. 85 (1904) ].

Unquestionably, the lower court had before it a *prima facie* showing of the facts upon which plaintiff based its plea for relief. The complaint essentially alleged that defendants had appropriated performances embodied in plaintiff's recordings. The defendants' answer essentially admits this. The question, then, which this Court must decide, is: Did the actions of the defendants amount to such a breach of plaintiff's rights as to entitle plaintiff to injunctive relief? If so, then the lower court erred for "where the case made out by the complainant is perfectly clear, and he has complied with all the requirements of the law for the issuance of an injunction, he is entitled to the injunction as a matter of right." 43 C. J. S. Injunctions § 14, citing *Metcalf v. Huntley-Richardson Lumber Co.*, 170 S. C. 226, 170 S. E. 162, 168 (1933).

Judge Ness' order, and the parties' briefs, contain a lengthy discussion of cases involving unlawful appropriation and exploitation.

A consideration of this matter must begin with *International News Service v. Associated Press*, 248 U. S. 215, 39 S. Ct. 68, 63 L. Ed. 211 (1918), "one of the most important cases, if not the most, in the law of unfair competition." 2 Callman, Unfair Competition, Trademarks, and Monopolies § 60.1 (3d) ed. 1968) [hereinafter cited as "Callman"]. In that case the parties were competitors in the gathering and distribution of news. Suit was brought to restrain INS from copying news from bulletins and from early editions of newspapers serviced by AP, and from otherwise pirating AP's news. The Court based its decision upon "the question of unfair competition in business" rather than on "the question of property in news matter at common law, or the application of the copyright act." In affirming the district court's grant of a preliminary injunction, the Court said, at pages 239-240, 39 S. Ct. at page 72:

". . . [D]efendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and . . . is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business."

The *INS* case "postulated a new concept of unfair competition in focusing upon the competitive relationship and stressing the reciprocal rights and duties that are peculiar to it and emanate from it . . . Moreover, the majority opinion recognizes two new causes of action . . . based upon the misappropriation and the exploitation of a competitor's business values." Callman § 60.3.

Two 1964 decisions of the United States Supreme Court, *Sears Roebuck & Co. v. Stiffel Co.*, 376 U. S. 225, 84 S. Ct. 784, 11 L. Ed. (2d) 661, and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U. S. 234, 84 S. Ct. 779, 11 L. Ed. (2d) 669, are thought by some (*e.g., CBS v. DeCosta,*) 377 F. (2d) 315 (1st Cir. 1967) to have laid to rest the *INS* doctrine, even though the opinions in those cases do not expressly refer to INS. These cases involved the copying by the defendant of the plaintiff's design of a lamp or light fixture. The Supreme Court held that a state law of unfair competition cannot impose liability for the copying of an article which was not protected by either a federal patent or copyright. In *Compco,* Mr. Justice Black said:

"Today we have held [in *Sears*] that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. 1, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." [376 U. S. at 237, 84 S. Ct. at 782.]

The law of unlawful exploitation is, then, somewhat confused at the present time, with *INS* on the one hand and *Sears* and *Compco* on the other. In Callman § 60.4(c) we find the following:

"Despite the proliferating confusion generated by *Sears* and *Compco,* as reflected in subsequent decisions, it seems that the courts are increasingly inclined to limit the Supreme Court's sweeping statements wherever possible to the area of patented and copyrighted articles rather than to apply them to other areas of unfair competition. Such areas are, for instance . . . misappropriation and exploitation of a business organization such as . . . record . . . piracy. . . ."

The defendants infer that the *INS* doctrine is no longer viable—although the decision has never been expressly overruled—and that the *Sears* and *Compco* holdings govern the determination of this case. For this reason, we limit our consideration to cases decided since those decisions were handed down. We further limit our consideration to cases involving "disklegging," to the exclusion of cases involving other types of alleged misappropriations. We note that the cases in this category have expressed unanimous disfavor toward this practice.

*Capitol Records, Inc., v. Greatest Records, Inc.,* 43 Misc. (2d) 878, 252 N. Y. S. (2d) 553 (1964), was decided approximately three months after *Sears* and *Compco* and involved facts substantially identical to this case. There the complaint alleged unfair competition by the defendants' rerecording of performances by "The Beatles" from Capitol's

albums. A temporary injunction was granted, the Court stating that *Sears* and *Compco* were "not applicable to the subject matter and devious conduct of defendants which [the] court [was] presently called upon to deal with."

*Capitol Records, Inc., v. Erickson,* 2 Cal. App. (3d) 526, 82 Cal. Rptr. 798 (1969), was an appeal from a preliminary injunction restraining defendant's "disklegging." After a lengthy discussion of *Sears* and *Compco* the Court affirmed the injunction, noting that:

" . . . [Defendant] has not merely copied or imitated discs or tapes produced by Capitol, rather, [defendant] has appropriated the product itself—performances embodied on the records. . . . It is reasonable to conclude that permitting such appropriation would discourage invention and free competition—and that those engaged in the recording industry, would be inclined not to utilize their skill and efforts, and expend large amounts of money, in producing unique recordings, but would wait for a recording to be produced, and then duplicate it and sell it, at maximum profit and with minimum effort and expense."

A third record piracy case involving substantially the same facts as are involved here was decided in Illinois in 1970. *Capitol Records, Inc., v. Spies,* 264 N. E. (2d) 874 (Ill. App.). The lower court, relying on *Sears* and *Compco,* had denied a temporary injunction. In reversing, the appellate court pointed out that:

"Whereas in [*Sears* and *Compco*] the court was concerned with the copying of products which were not patented, in the instant case *Spies* was actually appropriating another's property. Rather than the *Sears* and *Compco* decisions, we find that the case of [*INS*] is controlling."

In *Liberty/UA, Inc. v. Eastern Tape Corp.,* 11 N. C. App. 20, 180 S. E. (2d) 414 (1971), another case arising under facts basically identical to the facts of this case, *Sears* and *Compco* were distinguished on the now-familiar "copying versus appropriating" basis. Of particular interest

in that case was the fact that the plaintiff was faced with a statute identical to § 66-101 of our Code (footnote 1, *supra*), both states having enacted it in 1939. In discussing the effect of the statute on that case, the court said, and we agree

" . . . It is unlikely that in 1939 the legislature had heard of this type of conduct [record piracy], and we cannot conceive that one of its purposes in enacting G. S. § 66-28 was to make legitimate such unfair competitive practice.

"G. S. § 66-28 was enacted shortly after the Federal District Court for the Eastern District of North Carolina held that Fred Waring had a common law property right in its orchestra's recordings and could prevent defendant from playing the recordings over a radio station without his permission. *Waring v. Dunlea,* 26 F. Supp. 338 (E. D. N. C. 1939). The effect of G. S. § 66-28 was to overrule the *Waring* decision by eliminating any common law right to restrict the use of a recording sold for use in this State. However, we interpret "use", as employed in the statute, to mean the use for which a recording is intended; *i.e.,* the playing of the recording. Thus, under the statute, any record sold in commerce for use in this State may be played privately, publicly, and commercially without restriction. It does not follow, however, that the performance contained on the record can be re-recorded onto another record and the re-recording sold in competition with the original producer. To so hold would, in our opinion, give a construction to the statute that was never intended."

One further case, though somewhat dissimilar, might be mentioned at this point. In *Tape Industries Association of America v. Younger,* 316 F. Supp. 340 (C. D. Cal. 1970), suit was brought challenging a California statute which makes record piracy a misdemeanor. The plaintiffs in that suit, relying on *Sears* and *Compco,* insisted that the statute unconstitutionally intruded on federal copyright policies. In holding that the statute is a "tolerable and permissible

state regulation directed against theft and appropriation of a saleable product," the court said:

" . . . [P]laintiffs in the instant case do not imitate the product of the record companies. They actually take and appropriate the product itself—the sounds recorded on the albums—and commercially exploit the product. *Sears* and *Compco* would cover and immunize the plaintiffs here only if they had copied and imitated the product—that is, if they had listened to the sounds performed and embodied on the records and then had expended the necessary sums to copy and imitate the sounds on their own tapes."

The facts before the lower court are in large measure undisputed. There can be little contest remaining as to the facts when the case is tried on its merits. When one recognizes the legal proposition that "disklegging" is wrongful it becomes clear that a temporary injunction should have been granted. The temporary injunction could have been denied either because (1) defendants' acts were not wrongful, or (2) because sufficient facts were not before the court to warrant an application of the rule of law. We think the lower court erred in failing to directly meet the issue of whether the defendants' acts were wrongful so as to violate plaintiff's rights.

We do not agree with Judge Ness when, in denying the injunction, he reasoned that: "The only possible damage which will result from a denial of plaintiff's motion is a loss of profits which will be readily ascertainable and recoverable and hence such damages are not irreparable." In *Kirk v. Clark*, 191 S. C. 205, 4 S. E. (2d) 13 (1939), we said:

" . . . whether a wrong is irreparable, in the sense that equity may intervene, and whether there is an adequate remedy at law for a wrong, are questions that are not decided by narrow and artificial rules. The Courts proceed realistically if the threatened wrong involves actual damage; the mere uncertainty of fixing the measure of such damage to the injured party may itself be sufficient to justify

the exercise of equitable jurisdiction; and if the available legal remedy in a given case reduces itself to a matter of words, rather than to a matter of efficacy, because of its impracticability, or because the threatened acts may continue during the progress of an action at law, or because successive actions at law would be necessary to protect the plaintiff's rights, equity will hold that the existence of the legal remedy is not an obstacle to the exertion of the equitable power."

The fact that CBS might litigate hereafter and seek damages is not a basis for denying a temporary injunction under the facts of this case.

We think that the North Carolina Court of Appeals in *Liberty, supra,* correctly recognized the question involved in unlawful competition contests, as: "Has the plaintiff's legitimate business been damaged through acts of the defendants which a court of equity would consider unfair?" The facts of this case demand an unequivocal "yes" to this question. Defendants are surely "reaping where they have not sown." "The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business." *INS, supra.*

We find the reasoning of *INS, Liberty, Tape Industries,* and the three *Capitol Record* cases to be persuasive if not indeed mandatory. The parasitic acts of defendants violated plaintiff's legal rights. Injunctive relief should have been granted to protect those rights.

A temporary injunction as prayed for in the complaint is hereby granted. The case is remanded to the lower court for the setting of a bond as provided in Section 10-2057 of the Code and for determination of all other pending issues.

Reversed.

Moss, C. J., and Lewis and Brailsford, JJ., concur.

Bussey, J., dissents.

Bussey, Justice (dissenting):

This appeal is before us on the briefs and without the benefit of oral argument, pursuant to Rule 29. The proposed majority opinion, in effect, decides, on the merits, a most important question of completely novel impression in this jurisdiction, without the benefit of all the facts; without the benefit of any finding of fact by either a court or jury below; without the benefit of any oral argument; without even attempting to pass upon all the asserted defenses, and without the benefit of an in point decision from a court of last resort of any other jurisdiction. Even the "disklegging" decisions from lower tribunals of other states, relied upon in the majority opinion, are not completely in point factually with the case at bar.

The reversal of the lower court under the circumstances of this case is, to my mind, a complete departure from the basic and fundamental principles which have heretofore guided this Court in appeals from the granting or refusal of temporary injunctions. The general rule in this State is that, with exceptions not here involved, a temporary injunction is not a matter of right but of grace, resting in the sound discretion of the judge. *Pelzer v. Hughes,* 27 S. C. 408, 3 S. E. 781; West's South Carolina Digest, Injunction Key 135. Exceptions to the general rule are embodied within the following aptly stated language in the case of *Alderman & Sons Co. v. Wilson,* 69 S. C. 156, 48 S. E. 85,

"The authorities hold that where the action is for the *sole purpose of an injunction,* and a temporary injunction is essential to the assertion and *preservation of a legal right,* if established as alleged in the complaint, it would be error of law to refuse a temporary injunction. *Strom v. Am. Mortg. Co.,* 42 S. C. 101, 20 S. E. 16; *Seabrook v. Mostowitz,* 51 S. C. 434, 29 S. E. 202; *Cudd v. Calvert,* 54 S. C. 457, 32 S. E. 503; *Oil Co. v. Ice Co.,* 62 S. C. 196, 40 S. E. 169; *Riley v. Charleston Union Sta. Co.,* 67 S. C. 84, 45 S. E. 149." (Emphasis added.)

One essential condition to the granting of a temporary injunction is that it must appear that the injunction is rea-

sonably necessary to protect the *legal rights* of the plaintiff pending the litigation. *Childs v. City of Columbia,* 87 S. C. 566, 70 S. E. 296.

The instant case is to my mind one in which the matter of a temporary injunction was clearly addressed to the sound discretion of the trial judge, it being clearly distinguishable from any case coming to my attention in which the lower court's refusal of a temporary injunction has been held erroneous. The action is not for the *sole purpose of an injunction* and it is obvious that a temporary injunction is not essential to the *assertion or preservation of any legal right* alleged in the complaint of plaintiff; any rights it has remain fully preserved and may be and surely will be fully asserted in a trial upon the merits. Accordingly, the essentials whch would entitle the plaintiff to a temporary injunction, as a matter of law, are here entirely absent. I would, therefore, affirm.