Milton Eugene BROYLES, Appellant,

v.

The STATE of Texas, Appellee.

Charles Curtis O'QUINN, Appellant,

v.

The STATE of Texas, Appellee.

William A. RICHARDSON, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 53390 to 53392.

Court of Criminal Appeals of Texas.

June 14, 1977.

Paul D. Eaton, Curtis D. Glover and Kenneth D. Carden, Dallas, for appellants.

Henry Wade, Dist. Atty., John H. Hagler, John R. Roach and James K. Johnson, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

In a joint trial before a jury, appellants Milton Eugene Broyles, Charles Curtis O'Quinn and William A. Richardson on separate complaints and informations were convicted of selling a sound recording that each knew had been reproduced without the written consent of the owner of the original recording. See Art. 9012, Sec. 2(2), V.A. Tex.Civ.Stats.[1] Punishment of Broyles and Richardson was assessed at a fine of $1500 each, and of O'Quinn, at a fine of $2000.

The information in each case charged that the named appellant on or about February 2, 1975, in Dallas County, did unlawfully

"Offer for sale and sell to L. E. Beilharz a sound recording, to-wit: one 8 track tape title 'Sweet Baby James, by James Taylor,' knowing that said recording had been reproduced without the written consent of Warner Brothers' Records, the owner of the original recording."

1. "Art. 9012. Reproduction for sale, or sale or offer for sale, of a sound recording without owner's consent

"Section 1. As used in this Act, 'owner' means the owner of the master recording, master disc, master tape, master film, or other device used for reproducing recorded sound on a phonograph record, disc, tape, film, or other material on which sound is recorded and from which the transferred recorded sound is directly or indirectly derived.

Appellants initially contend that their convictions are void because the informations do not allege the culpable mental state required by V.T.C.A. Penal Code, Sec. 6.02, that they intentionally, knowingly, or recklessly offered for sale and sold the sound recording. No motion to quash the informations on this ground was filed in the trial court.

Section 6.02, supra, provides:

"(a) Except as provided in Subsection (b) of this section, a person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires.

"(b) If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element.

"(c) If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required under Subsection (b) of this section, intent, knowledge, or recklessness suffices to establish criminal responsibility.

"(d) Culpable mental states are classified according to relative degrees, from highest to lowest, as follows:

"(1) intentional;

"(2) knowing;

"(3) reckless;

"(4) criminal negligence.

"(e) Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged."

"Sec. 2. A person commits a misdemeanor punishable by a fine not to exceed $2,000 if he:

"(1) knowingly reproduces for sale any sound recording without the written consent of the owner of the original recording; or

"(2) sells or offers for sale any sound recording that he knows has been reproduced without the written consent of the owner of the original recording."

■ V.T.C.A. Penal Code, Sections 6.02 and 6.03 establish the requirements and definitions of culpability for the Code, and Section 1.03(b) makes it clear that these provisions, as well as the other provisions of Titles 1, 2 and 3 of the Code, apply to offenses defined by the civil statutes "unless the statute defining the offense provides otherwise." See *Bocanegra v. State,* 552 S.W.2d 130 (1977). Since nothing in Article 9012, supra, provides otherwise, Sections 6.02 and 6.03 apply to this civil statute.

■ Art. 9012, Sec. 2(2), V.A.Tex.Civ. Stat., supra, does prescribe in the definition of the offense the culpable mental state that the accused at the time he sold or offered for sale the sound recording must know that it had been reproduced without the written consent of the owner of the original recording. This is the same culpable mental state required for the offense of knowingly reproducing for sale a sound recording, as set out in Sec. 2(1) of Art. 9012. The information tracks the statute creating the offense, and alleges the required culpable mental state set forth in the statute for the offense, thus complying with V.T.C.A. Penal Code, Sec. 6.02. See *Teniente v. State,* Tex.Cr.App., 533 S.W.2d 805. Cf. *Bocanegra v. State, supra; Zachery v. State,* 552 S.W.2d 136 (1977).

Appellants' contention in the first ground of error is without merit, and is overruled.

In the second ground of error, appellants contend the court violated their Sixth Amendment right of confrontation and cross-examination by restricting his cross-examination of State's witness Billy Emerson.

Emerson was attorney in Dallas for the Southwest Association of Recording Merchandisers, a group of companies and individuals operating legitimately in the music industry. He was also manager of Records of Dallas, Inc., engaged in the music recording business. He qualified as an expert in the field of the music recording industry, and the court so found. He testified that in January and February, 1975, he discovered that these appellants were engaged in the business of dealing in and selling "bootleg tapes" in violation of Art. 9012, Sec. 2(2), V.A.Tex.Civ.Stat., supra, and notified each of them to that effect, giving to each a copy of that statute. Thereafter, on February 22, he arranged for Dallas police officers to investigate appellants' activities, and after each appellant had sold to Dallas undercover officers the records as alleged in the informations they were arrested.

On cross-examination, appellants placed in evidence a letter written February 25, 1975, by Emerson as attorney for the Southwest Association of Recording Merchandisers to a firm in Longview stating in part: "I have received reliable information that you have purchased large quantities of eight-track tape cartridges from a Charles O'Quinn on the 'Hemesphere Sound Label.' "

Appellant then asked and the witness replied:

"Where did you receive this information."

"A That's confidential."

The State objected to the answering of the question "until he establishes its relevancy."

A hearing was then conducted in the absence of the jury, and in answer to the court's inquiry as to the relevancy of the question, appellant replied:

"It's relevant to show that he did in fact, acquire information from confiscated materials contrary to the Texas Statutes which state that it is a felony for confiscated materials to be released to a party not a member of law enforcement."

The State's view, as argued by the prosecuting attorney, was that "whatever information he (Emerson) had about some offense that occurred in Longview" after the commission of this offense "is not relevant or material to the offense charged here." The court found, after argument of counsel, that any answer would not "solve any issue which will show his bias or interest, financial interest, in anything, and sustained the State's objection." However, the court permitted appellant to cross-examine the witness at length concerning the Longview matter.

■ The State had not, on direct examination, introduced any testimony concerning the subject matter of the letter to the Longview firm. This was brought into evidence for the first time on cross-examination. We have reviewed the subject matter of appellants' complaint and agree with the trial court that there is no showing of any relevancy concerning where the witness received the information stated in the letter. Neither is there any showing of harm to appellants by virtue of the court's ruling. The second ground of error is overruled.

Appellant next contends that Art. 9012, V.A.Tex.Civ.St., the statute under which this conviction was obtained, is void in that "it is an attempted regulation of interstate commerce by a State government" in violation of Art. 1, Sec. 8, Clause 3 of the United States Constitution. That clause provides that the Congress shall have Power  .  .

> "to regulate Commerce with foreign Nations, and among the Several States, and with the Indian Tribes;  .  .  ."

■ As stated by our Texas Supreme Court in *Robinson v. Hill*, 507 S.W.2d 521:

> "In passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily, and the burden is on one who challenges an act to establish its unconstitutionality. *Smith v. Craddick*, Tex.Sup., 471 S.W.2d 375; *Smith v. Davis*, Tex. Sup., 426 S.W.2d 827, and authorities there cited.  .  .  ."

See also 12 Tex.Jur.2d, p. 385, Constitutional Law, Sec. 42.

2. California Penal Code, Sec. 653h (1968), Transfer of recorded sounds for unlawful use, sale, provides in part:

"(a) Every person is guilty of a misdemeanor who:
"(1) Knowingly and willfully transfers or causes to be transferred any sounds recorded on a phonograph record, disc, wire, tape, film .  .  . or other article on which sounds are recorded, with intent to *sell* or cause to be sold .  .  . such article on which such sounds are so transferred, without the consent of the owner.

The Supreme Court of the United States, in upholding a California statute[2] similar to Art. 9012, supra, in *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163, stated that the California statute "evidence[d] a legislative policy to prohibit 'tape piracy' and 'record piracy' conduct that may adversely affect the continued production of new recordings, a large industry in California." See also *Tape Industries Association of America v. Younger*, D.C., 316 F.Supp. 340, and cases cited.

It is evident that the passage of Art. 9012, supra, by the Texas Legislature evidenced that same policy.

In *Plumley v. Massachusetts*, 155 U.S. 461, 15 S.Ct. 154, 39 L.Ed. 223 (1894) the law question was "whether, as contended by the petitioner, the statute under examination, in its application to sales of oleomargarine brought into Massachusetts from other states, is in conflict with the clause of the Constitution of the United States investing Congress with power to regulate commerce among the several states."

The Court stated:

"Several cases in this court were cited in argument to support the contention that the grant of power to Congress to regulate interstate commerce extended to such legislation as that enacted by the Commonwealth of Massachusetts. Let us see whether those cases announce any principle *that compels this court* to adjudge that the states have surrendered to the general government the power *to prevent fraud in the sales of property*." (Emphasis added).

After discussing a number of federal Supreme Court cases, the Court proceeded to say:

"(2) * * *
"(b) As used in this section, 'person' means any individual, partnership, corporation or association; and 'owner' means the person who owns the master phonograph record, .  .  . master tape  .  .  . or other device used for reproducing recorded sounds on phonograph records  .  .  . tapes  .  . or other articles on which sound is recorded, and from which the transferred recorded sounds are directly or indirectly derived."

"In none of the above cases is there to be found a suggestion or intimation that the Constitution of the United States took from the States the *power of preventing deception and fraud* in the sale, within their respective limits, of articles, in whatever state manufactured, or that that instrument secured to anyone the privilege of committing a wrong against society." (Emphasis added)

■ We conclude that the Legislature of the State of Texas is not precluded by the Commerce Clause of the United States Constitution, Art. 1, Sec. 8, Cl. 3, from exercising the police power of the State in prohibiting record and tape piracy by the unauthorized reproduction for sale or knowingly selling reproduced sound recording, as provided in Art. 9012, V.A.Tex.Civ.Statutes, supra. See Texas Attorney General's opinion No. M–1114, 1972; annotation in 40 ALR 3rd Series, page 566 on Unfair Competition by Direct Reproduction of Literary, Artistic, or Musical Property, following opinion in *Capitol Records v. Erickson et al.,* 40 A.L.R.3d 553 (California Court of Appeals, Second District, Division 1, 1969 also reported in 2 Cal.App.3d 526, 82 Cal.Rptr. 798, writ den., 398 U.S. 960, 90 S.Ct. 2176, 26 L.Ed.2d 545).

The third ground of error is overruled.

Appellant next argues that the court reversibly erred in permitting State's witness Fern Shapiro to testify by hearsay to facts outside of her personal knowledge in order to prove that Warner Brothers Records owned the original recording of "Sweet Baby James by James Taylor" as alleged in the indictment.

State's exhibit No. 12 is a contract between Warner Brothers Records and Marlebone Productions giving Warner "the exclusive services of James Taylor as a recording artist." It was admitted in evidence during the testimony of Fern Shapiro, an official of Warner Brothers Records as Director of Royalties and Licensing. When the contract was first offered by the State, appellants objected on the ground that

"We have no way of knowing whether corporations did, in fact, approve this

contract . . . Second, we do not have any way of knowing if, in fact, either of these corporations, had a right to represent 'Baby James' exclusively . . . we have no way of knowing whether they were in fact corporations, or what their relation was."

When the court sustained this objection, the State proved by Shapiro that the contract had been executed in her presence, and that she had the care, custody and control of the records of the company, including this contract, which records were kept in her custody in the regular course of the company's business. The State also placed in evidence a copy of the incorporation of Warner Brothers Records, Inc., also taken from the records in the custody of the witness. Thereupon, Exhibit 12 was admitted in evidence over appellant's objection that

"I don't think that this witness has satisfactorily shown that she is knowledgable of the corporate activities as to be able to testify whether they represent the incorporation of the companies that she is employed by."

■ The court did not err in overruling the objection and admitting State's Exhibit No. 12. Art. 3737e, V.A.Civ.St.; *Prine v. State,* Tex.Cr.App., 509 S.W.2d 617; *Lawless v. State,* Tex.Cr.App., 495 S.W.2d 241.

Appellant complains that Shapiro "was allowed to testify that James Taylor is the exclusive owner of Marlebone Productions, and that state's exhibit No. 12 was, in effect, an exclusive recording agreement between Warner Brothers Records and James Taylor."

Shapiro testified that in her employment with Warner Brothers Records, she was responsible for the direct administration of all contracts for Warner Brothers Records, and that she was present at the execution of State's exhibit No. 12. She stated without objection that while Taylor had not personally signed the contract, Warner had a production agreement "with his production firm, which is Marlebone Productions," and that at the time the record of Sweet Baby

James was made, Taylor was under contract with Warner Brothers Records. We quote as follows from her testimony:

"Q    Mrs. Shapiro, I'm going to ask you if you're familiar with the contractual agreements between Warner Bros. Records and James Taylor?

"A    Yes, sir.

"Q    If you would, just explain to the jury why you would be familiar with that sort of thing?

"A    I am responsible for the direct administration of all contracts for Warner Bros. Records.

"Q    And to your knowledge, has James Taylor ever signed a contract with Warner Bros. Records?

"A    Has he, himself, signed a contract?

"Q    Yes, ma'am.

"A    No, his signature is not on the contract.

"Q    I'm sorry. I don't understand.

"A    We have a production agreement with his production firm, which is Marlebone Productions.

"THE COURT REPORTER: I'm sorry. What was the name of the company?

"THE WITNESS: Marlebone Productions.

"THE COURT REPORTER: Would you spell it, please?

"THE WITNESS: (Spelling) M-a-r-l-e-b-o-n-e.

"Q    (By Mr. Roach) Are you familiar with the album or tape recording 'Sweet Baby James' by James Taylor?

"A    Yes, I am.

"Q    At the time that album or tape recording was made, was he or was he not under contract to Warner Bros. Records?

"A    Yes, sir.

*    *    *    *    *    *

"Q    The question is: Who does Marlebone Productions represent in that contract?

"MR. WIGHTMAN: Your Honor, I'll have to object to that 'who do they represent in that contract.'

"THE COURT: In the contract, I'll sustain.

"Q    (By Mr. Roach): Who do they represent?

"A    James Taylor.

"Q    Do they represent other artists as well?

"A    No.

"Q    It's a fact that James Taylor owns Marlebone Productions, doesn't he?

"A    That's correct.

"Q    Now, I'll ask you this from either the contract terms or your own knowledge. First of all, does James Taylor record exclusively for Warner Bros. Records, Incorporated?

"A    Yes, he does.

"MR. WIGHTMAN: Your Honor, I'll have to object due to the fact that, first of all, the witness has already testified that their only contact with Mr. James Taylor is with Marlebone—whatever it is. The State is now asking her to go beyond the powers of Marlebone when she has already admitted that their only connection with him is with Marlebone.

"THE COURT: Overrule your objection.

"MR. WIGHTMAN: Exception, please.

*    *    *    *    *    *

"ANSWER: Yes, he does.

"THE COURT: Go ahead, Next question.

"Q    (By Mr. Roach) Among those recordings of James Taylor for Warner Bros. Records, Incorporated, would they include 'Sweet Baby James' by James Taylor?

"A    Yes, they would.

"Q    Is Warner Bros. Records, Incorporated the owner of the original recording of that recording 'Sweet Baby James' by James Taylor?

"A    Yes, they are.

"Q    Is Warner Bros. Records, Incorporated also known as Warner Bros. Records?

"A    Yes, it is."

■ The record reflects that Fern Shapiro, in her executive capacity as Director of Royalties and Licenses, was thoroughly familiar with the transactions between her employer and James Taylor and his production company. Much of her testimony of that relationship was introduced without objection. Her testimony establishes that her knowledge of the connection between Marlebone and Taylor was first hand personal information obtained through her responsible obligatory duties concerning the recording contracts of her employer. The record does not reflect that her information was based on hearsay obtained outside of her personal knowledge, as contended by appellant in this ground of error. There was no objection on the ground that her testimony was not the best evidence of the facts she was stating.

Reversible error is not presented, and appellant's contentions are overruled.

The judgments are affirmed.

Opinion approved by the Court.