**SUMMIT MACHINE TOOL MANUFACTURING CORP.,**
Plaintiff–Appellant,

v.

**VICTOR CNC SYSTEMS, INC.;**
**Machinery Trade Center,**
Defendants–Appellees.

No. 91–55993.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 1, 1993.

Decided Oct. 25, 1993.

**1436**

David Jacobs, Coudert Brothers, Los Angeles, CA, for plaintiff-appellant.

Paul A. Larsen, Ku & Fong, Los Angeles, CA, for defendant-appellee.

Before: HUG, FERGUSON and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are called upon to decide, in this unfair competition case involving industrial machine tools, whether the "bodily appropriation" standard applies to a Lanham Act claim.

**I**

Summit Machine Tool Manufacturing Corporation ("Summit"), an Oklahoma corporation, designs, builds, and markets industrial machine tools. In 1986, Summit entered into a contract with Zhenjiang Machine Tool Works ("ZMTW"), a Chinese manufacturer, to build lathes from Summit's designs. The agreement provided that Summit had the exclusive right to sell outside of China all lathes manufactured by ZMTW in accordance with Summit's designs. Summit worked with ZMTW over a period of several years to refine the new lathes.

During 1989 and 1990, Victor CNC Systems, Inc. and Taiwan Machinery Trade Center (collectively "Victor"), California corporations, purchased seven lathes from ZMTW for resale in the United States. Summit learned of the purchase by Victor in September 1990. In a letter to Victor dated October 1, 1990, Summit notified Victor of its contract with ZMTW and demanded that Victor stop selling the lathes. Victor did not respond. Summit again wrote to Victor in January 1991. Victor refused to cease its efforts to market the lathes.

Summit then brought suit, alleging false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition under California Business and Professions Code § 17200 and California common law; intentional interference with contract; and intentional interference with prospective economic advantage. Federal jurisdiction over Summit's state law claims is premised on the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), as well as the diversity of the parties under 28 U.S.C. § 1332.

The district court denied Summit's ex parte motion for a temporary restraining order. Victor then stipulated to the issuance of a preliminary injunction which prohibited Victor from selling any of the disputed lathes.

A two day bench trial was held in the district court. At the beginning of trial Summit admitted that there was no evidence that Victor knew of Summit's contract with ZMTW at the time it purchased the seven lathes. On that basis, the district court granted judgment in favor of Victor on Summit's claims for intentional interference with contract and interference with prospective economic advantage. The court concluded that Victor "had every right to sell the lathes having rightfully acquired them."

The primary issue at trial was the degree of similarity between Summit's lathes and the lathes sold to Victor. The district court concluded that the Summit and Victor lathes were not substantially similar. On that basis, the district court held that Summit's Lanham Act claim failed. For the same reason, the court concluded that Summit's unfair competition claims failed. Moreover, the court held that, to the extent that Summit sought to protect its designs, Summit's unfair competition claims were preempted by federal patent and copyright laws. The court also found that the lack of evidence that Victor had any knowledge of Summit's contract with ZMTW precluded any claim for unfair competition with regard to Victor's purchase of the lathes.

Accordingly, the district court entered judgment for Victor and lifted the preliminary injunction. Summit timely appeals.

**II**

**A**

Summit's first claim is based on section 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a). Summit claims that the lathes sold under Victor's name were actually designed by, and manufactured for, Summit. The Lanham Act proscribes, in connection with goods, any false designation of origin "which is likely to cause confusion, or to cause mistake, or to deceive ... as to [their] origin." 15 U.S.C. § 1125(a)(1). According to this court, the Lanham Act "has progressed far beyond the old concept of fraudulent passing off, to encompass any form of competition or selling which contravenes society's current concepts of 'fairness.'" *Smith v. Montoro*, 648 F.2d 602, 604 (9th Cir.1981). Thus, the Act proscribes conduct that is the "economic equivalent" of passing off, including "reverse palming off."[1] *Id.* at 605.

 "Reverse palming off occurs with the direct misappropriation of the services or goods of another." *Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir.1990) (citing *Smith*, 648 F.2d at 606–607). "Express reverse passing off" occurs when one party purchases or otherwise obtains a second party's goods, removes the second party's name, and then markets the product under its own name. *Smith*, 648 F.2d at 605. "A defendant may also be guilty of reverse palming off by selling or offering for sale another's product that has been modified slightly and then labeled with a different name." *Roho*, 902 F.2d at 359. This court has explained that

> [a]s a matter of policy, such conduct, like traditional palming off, is wrongful because it involves an attempt to misappropriate or profit from another's talents and workmanship. Moreover, in reverse palming off cases, the originator of the misidentified product is involuntarily deprived of the advertising value of [his] name and the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product. The ultimate purchaser (or viewer) is also deprived of knowing the true source of the product and may even be deceived into believing that it comes from a different source.

*Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1406–1407 (9th Cir.1988) (quoting *Smith*, 648 F.2d at 607).

In essence, Summit complains that Victor has sold and will continue to market a slightly modified version of the Summit lathe. *See Roho*, 902 F.2d at 359. It cannot be disputed that Victor has the right to *copy* Summit's lathe. *See id.* at 360. The common law has long recognized that an unpatented article "is in the public domain and may be made and sold by whoever chooses." *Id.* "Although copyists undoubtedly incur the enmity of the product's creator, they serve the public interest by promoting competition and price reductions." *Id.* "Accordingly, those with the ingenuity to copy a popular but unpatented product are entitled to do so, as long as they do not run afoul of the unfair trade practices laws." *Id.* Thus, while Victor is permitted to copy the Summit lathe, the question here is whether in purchasing the lathes in question from ZMTW, Victor engaged in an unfair trade practice—namely reverse palming off. *See id.*

In this case, the district court framed its inquiry as whether the lathe Victor was selling was actually a Summit lathe. This is not a case where Victor acquired a product that was clearly a Summit lathe, made modifications to it, and sold it as its own product. Victor made no modifications to the product it acquired. Instead, the inquiry is whether the product it acquired was a Summit product. The lathes ZMTW manufactured and sold to Summit differed from those it manufactured for sale by others in China. It was seven of the latter lathes Victor bought for sale under its own label. They were not identical lathes, but it is conceivable that the difference between the two lathes could be so inconsequential as to be considered the same. The district court found to the contrary. After trial, the district court concluded that "the Summit and Victor lathes were not the same; they were not inconsequentially different; and they were not substantially similar."

Summit insists that the district court employed a "rigid, previously unseen standard" that erroneously focused on physical dissimilarities between the lathes, precluding the court from asking "the more fundamental question of who was responsible for the de-

---

1. The terms "reverse palming off" and "reverse passing off" are used interchangeably.

sign and manufacturing" of the lathes marketed by Victor and "whether Victor played a sufficiently significant part in their development and manufacture such that the public would not be misled by the Victor label into believing that Victor was responsible for the quality and make-up of the lathes."

We must reject Summit's contention. The standard employed by the district court is wholly consistent with that set out in *Shaw v. Lindheim*, 919 F.2d 1353, 1364 (9th Cir. 1990); *see also Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir.1984) ("without substantial similarity there can be no claim for reverse passing off under section 43(a)"). The plaintiff in *Shaw* claimed that the defendant's television pilot was substantially similar to a script he had written. Affirming the district court's dismissal of the plaintiff's Lanham Act claim, the court concluded that substantial similarity was not sufficient under section 43(a) because our previous cases had "implicitly limited the 'reverse passing off' doctrine to situations of bodily appropriation." *Id.* (citing *Lamothe*, 847 F.2d at 1406, and *Smith*, 648 F.2d at 605). Thus, absent bodily appropriation of its lathe, Summit's claim must fail.

Summit argues that *Shaw* must be limited to the particular factual situation before the court in that case. According to Summit, the holding in *Shaw* was premised upon the fact that the plaintiff in that case was afforded protection for its script under the Copyright Act. The court therefore declined to "expand the scope of the Lanham Act to cover cases in which the Federal Copyright Act provides an adequate remedy." *Id.* 919 F.2d at 1364–65. Because Summit does not seek copyright protection nor does it seek protection in the nature of copyright, Summit believes that this case is distinguishable from *Shaw*. We see no basis for such a distinction. Like the plaintiff's script in *Shaw*, Summit's lathe falls within the spheres protected by, or intentionally left unprotected by, copyright and patent law. Moreover, the holding in *Shaw* is explicitly premised on the express purpose of the Lanham Act as well as precedent. *Id.* at 1364. We therefore see no reason to limit *Shaw* to situations where there is an alternative right to protection under the Copyright Act.

The district court's conclusion that the lathes bought by Victor and those manufactured for Summit were substantially different, and could not be considered as the same lathes, necessarily means it found no bodily appropriation. *See Litchfield*, 736 F.2d at 1358. Unless clearly erroneous, that finding is dispositive of Summit's Lanham Act claim. *See Shaw*, 919 F.2d at 1364.

**B**

Summit contends that the district court clearly erred in concluding that the lathes were substantially different. In reaching its conclusion, the district court relied on the testimony of William Allder, Summit's Vice-President of Operations, who was offered by Summit as an expert witness. The court found significant differences between the Summit and Victor lathes:

> Specifically, Summit lathes use inserted steel guideways in the bed of the lathes for greater durability and uniformity in the cutting done on the lathe. The Victor lathe has a solid cast iron bed way. Second, the lathes use different methods and mechanisms for braking; the Summit lathes have multidisc friction brakes that operate mechanically while the Victor lathes have a pedal that simply cuts off electricity to the motor. Third, the Summit lathe has a two-speed tailstock that makes it more versatile in its operation than the single speed tailstock Victor lathes. Fourth, the Summit lathes are mechanically operated via a clutch system while (at least some of) the Victor lathes have direct drive electric motors. Fifth, the buttons on the headstocks of each company's lathes are in different locations thus making the operation of each company's lathes somewhat different. Sixth, the Summit lathe's handwheel freewheels for safety, a feature not present on the Victor lathe. Seventh, the rapid traverse motor on the Victor lathe is larger and of a different configuration than the same motor on the Summit lathe. Finally, the Victor lathes are offered only in two tone gray

while the Summit lathes are available in either green or gray.

The court summed up its findings by stating that the lathes "were substantially different in some of their internal mechanics, in how the lathes were operated, and in their non-functional design."

Summit does not contend that the identified differences between the lathes do not exist. Instead, Summit argues that the differences are minor and insignificant when compared to the overall similarity of the designs. Thus, Summit argues that it was clear error not to find that its lathe had been modified slightly and then labeled with Victor's name. *See Roho*, 902 F.2d at 359. In addition, Summit insists that the district court only compared the Victor lathe to the final version of the Summit lathe without recognizing that the Victor lathe is almost identical to earlier versions of the Summit lathe.[2] Victor insists that the district court compared all the relevant lathes.

■ The Lanham Act's purpose is to prevent individuals "from misleading the public by placing their competitors' work forward as their own." *Shaw*, 919 F.2d at 1364. In light of the conceded differences between the lathes, the likelihood the two lathes will be confused is minimal. *Id.* We therefore conclude that the district court did not clearly err in finding that the Victor lathe was not a bodily appropriation of the Summit lathe.

### III

■ In addition to its claim for reverse palming off under the Lanham Act, Summit asserts a number of state law claims for unfair competition. The district court ruled that, to the extent Summit seeks protection for its design concepts under California law, California's unfair competition law is preempted by federal intellectual property law. The court noted that to protect Summit's designs from being utilized in or incorporated into Victor's product would be tantamount to giving Summit's designs patent

protection that they have not acquired and may not be able to acquire. Summit concedes that any attempt to protect its design from being copied, duplicated, or reproduced is preempted by federal law. Summit argues vigorously however that, rather than seeking to prevent Victor from appropriating its *idea*, it seeks to prevent the direct appropriation of the lathe itself. Summit's misappropriation claim is based on the contention that Victor has unfairly obtained the fruits of Summit's labor. Summit contends that its misappropriation claim is not preempted by federal law.

### A

Federal patent and copyright laws limit the states' ability to regulate unfair competition. According to the Supreme Court, state law is preempted when it enters "a field of regulation which the patent laws have reserved to Congress." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 167, 109 S.Ct. 971, 986, 103 L.Ed.2d 118 (1989) (internal quotation omitted). Where state law offers "patent-like protection for ideas deemed unprotected under the present federal scheme, [state law] conflicts with the strong federal policy favoring free competition in ideas." *Id.* The unfair competition statute at issue in *Bonito Boats* prohibited a particular method of copying an unpatented product. Because the statute was "aimed directly at preventing the exploitation of the design and the utilitarian conceptions embodied in the product itself" rather than "protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning such that they operate as a designation of source," *id.* 489 U.S. at 158, 109 S.Ct. at 981, the Supreme Court concluded that the statute was preempted by federal patent law.

■ Preemption analysis involves determining whether the state law claim contains an element not shared by the federal law; an

---

**2.** Rather than the nine specific differences listed by the district court, Summit argues that there are only four differences between the Victor lathe and the earlier version of its own lathe, all of which Summit believes are inconsequential: (1) a large "V" instead of an "S" on the chipguard; (2) the beveled edge of the headstock; (3) a different handwheel on the carriage; and (4) a larger rapid traverse motor.

element which changes the nature of the action "so that it is *qualitatively* different from a copyright [or patent] infringement claim." *Balboa Ins. Co. v. Trans Global Equities,* 218 Cal.App.3d 1327, 1340, 267 Cal. Rptr. 787 (1990); *Del Madera Properties v. Rhodes & Gardner, Inc.,* 820 F.2d 973, 977 (9th Cir.1987). Therefore, if copying the lathe or the plans for the lathe *in itself* infringes the state-created right, then the state-created right is preempted. *Balboa,* 218 Cal.App.3d at 1339–40, 267 Cal.Rptr. 787. Thus, "preemption law ... requires analysis of each theory [of unfair competition] to determine whether it contains the necessary qualitatively different extra element distinguishing it from copyright [or patent] protection." *Id.* at 1342, 267 Cal.Rptr. 787; *see also Del Madera,* 820 F.2d at 977.

**B**

In *Bonito Boats,* the Supreme Court defined unfair competition rather narrowly. The Court noted that "in the usual sense that the term is understood, ... the law of unfair competition has its roots in the common law tort of deceit: its general concern is with protecting *consumers* from confusion as to source." *Bonito Boats,* 489 U.S. at 157, 109 S.Ct. at 981. In contrast, the California Supreme Court has explicitly refused to limit the coverage of its unfair competition law to "deceptive practices." *Barquis v. Merchant's Collection Ass'n,* 7 Cal.3d 94, 101 Cal.Rptr. 745, 757, 496 P.2d 817, 829 (Cal. 1972). Rather, California's unfair competition law implicates a "broad range of claims." *Balboa,* 218 Cal.App.3d at 1341, 267 Cal. Rptr. 787 (1990).

The myriad branches of California's unfair competition law involve different elements and raise different issues. *See Balboa,* 218 Cal.App.3d at 1341, 267 Cal.Rptr. 787. As the *Balboa* court noted, "the breadth and analytical vagueness of [California's] unfair competition law complicates the preemption analysis greatly." *Balboa,* 218 Cal.App.3d at 1341, 267 Cal.Rptr. 787. For that reason, before we can determine whether Summit's claims are preempted, we must precisely identify the nature of Summit's claims.[3]

**1**

Summit argues that it has been injured because Victor, rather than taking the time, effort, and expense to copy Summit's lathes, instead simply purchased, and is now marketing at a lesser cost, lathes developed at considerable expense and effort by Summit. According to Summit, Victor's ability to di-

---

**3.** According to the complaint, Summit's second claim for relief is that Victor "gained an unfair competitive advantage by purchasing lathes that were designed by, and manufactured for, Summit" in violation of California Business and Professions Code § 17200. Summit's third claim for relief asserts that Victor's "advertising, promoting or other efforts to sell or actual sales of the lathes ... is an effort to pirate Summit's lathe designs and specifications" in violation of California common law.

The California Supreme Court has described the reach of § 17200 in broad terms:

The language of Section [17200] ... explicitly extends to any "unlawful, unfair *or* deceptive business practice"; the Legislature, in our view, intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur.... [T]he section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with " 'new schemes which the fertility of man's invention would contrive.' "

 \* \* \* \* \* ŕ

When a scheme is involved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent

to frustrate its consummation because this scheme is an original one.

*Barquis,* 101 Cal.Rptr. at 757–58, 496 P.2d at 829–30 (citations omitted). The remedies available under § 17200 are "cumulative to each other and to the remedies or penalties available under all other laws of the state." *Self Directed Placement Corp. v. Control Data Corp.,* 908 F.2d 462, 467 (9th Cir.1990); Cal.Bus. & Prof.Code § 17205.

Summit's fourth and fifth claims are for, respectively, intentional interference with contractual relations and intentional interference with prospective business advantage. Summit's intentional interference claims also fall within the broad rubric of unfair competition; *see Balboa,* 218 Cal.App.3d at 1341, 267 Cal.Rptr. 787; these claims are discussed, however, in section IV.

rectly appropriate the fruits of Summit's labor at little cost to itself has enabled Victor to market the lathes at a price Summit cannot meet, giving Victor a considerable, and unfair, competitive advantage. Victor insists that an unfair competition claim based upon a misappropriation theory is preempted by federal law. We must therefore determine the extent to which the tort of misappropriation has been preempted by federal law.

■ Misappropriation is one branch of California's unfair competition law. *Balboa,* 218 Cal.App.3d at 1342, 267 Cal.Rptr. 787. Finding its origin in *International News Service v. Associated Press, ("INS")* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), California's common law tort of misappropriation has three elements: "(1) the plaintiff has invested substantial time and money in development of its ... 'property'; (2) the defendant has appropriated the [property] at little or no cost; and (3) the plaintiff has been injured by the defendant's conduct." *Self Directed,* 908 F.2d at 467 (quoting *Balboa,* 218 Cal.App.3d at 1342, 267 Cal.Rptr. 787).

The vagueness of the elements of common law misappropriation has

engendered various preemption analyses. For example, in *Warner Bros. v. American Broadcasting Cos.,* [720 F.2d 231, 247 (2d Cir.1983) ], the court stated unequivocally: "state law claims that rely on the misappropriation branch of unfair competition are preempted, [citations]." Nimmer generally concludes that misappropriation that "consisted simply of the acts of reproduction and distribution ... undoubtedly constitutes a right 'within the general scope of copyright as specified by [17 U.S.C.S.] section 106.' " [1 *Nimmer on Copyright,* § 1.01[B][1] at 1–20.3]. At least one court, however, has found no preemption of misappropriation. *See Sargent v. American Greetings Corp.,* [588 F.Supp. 912, 924 (N.D. Ohio 1984) ].

*Balboa,* 218 Cal.App.3d at 1352–53, 267 Cal.Rptr. 787.

Victor argues that the suggestion found in *INS* and its progeny that a party has a protectable interest in the fruits of its labor is no longer good law. Victor is only partial-ly correct. If Summit was simply complaining that Victor has misappropriated the time and effort expended in the development and production of its *idea* for the lathe, its claim would be preempted by copyright and patent law. *See Del Madera,* 820 F.2d at 977. Such a claim lacks the "extra element" which changes the nature of the action. *Id.* On the other hand, *Del Madera* indicates that an unfair competition action for misappropriation of time and effort is cognizable if the claim contains an extra element which changes its nature. *Id.* at 978. The fundamental question, then, is whether Summit's claim for misappropriation adds the requisite extra element.

### 2

In the cases that indicate that a claim for misappropriation is still tenable, the extra element tends to be apparent. For example, the extra element identified in *Del Madera* was an alleged breach of fiduciary duty. *Id.; Oddo v. Ries,* 743 F.2d 630, 635 (9th Cir. 1984) (same); *see also Balboa,* 218 Cal. App.3d at 1351–53 & n. 34, 267 Cal.Rptr. 787. In *Self Directed,* 908 F.2d at 467, the extra element was an alleged breach of a confidential relationship. In *Capitol Records, Inc. v. Erickson,* 2 Cal.App.3d 526, 537, 82 Cal.Rptr. 798 (1969), *cert. denied,* 398 U.S. 960, 90 S.Ct. 2176, 26 L.Ed.2d 545 (1970), the extra element was the alleged palming off of the defendant's products as those of its competitor.

■ To the extent that Summit complains that Victor misappropriated the fruits of its labor by marketing Summit's lathe with Victor's name on it, such a claim is really a claim for reverse palming off. State unfair competition laws which seek to prevent reverse palming off are not preempted by federal law. *Tveter v. AB Turn–O–Matic,* 633 F.2d 831, 839 (9th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 300 (1981). The resolution of Summit's reverse palming off claim under California law turns on the same considerations as the resolution of Summit's reverse palming off claim under

**1442**

the Lanham Act. Thus, to the extent that it is a reverse palming off claim, Summit's state unfair competition claim must fail for the same reasons that its Lanham Act claim fails.

To the extent that Summit complains that Victor has appropriated lathes that Summit had the exclusive right to, Summit has stated a claim for intentional interference with contract. Such a claim includes the requisite extra element and therefore is not preempted by federal law. Summit's intentional interference claims are discussed in section IV.

■ Summit has not identified any other extra element that would provide it with relief for unfair competition under California law. To the extent that Summit may complain that Victor has "pirated" its lathe by employing a particularly unfair method of copying, such a claim is preempted by federal law.

**IV**

■ Summit asserts two additional claims. Summit argues that Victor intentionally interfered with its contract with ZMTW and that Victor interfered with Summit's prospective economic advantage.

■ To recover for intentional interference with a contractual relationship, Summit must show "(1) that [it] had a valid and existing contract, (2) that [Victor] had knowledge of the contract and intended to induce its breach, (3) that the contract was in fact breached by [ZMTW], (4) that the breach was caused by [Victor's] unjustified and wrongful conduct, and (5) that [Summit] has suffered damage." *Charles C. Chapman Building Co. v. California Mart,* 2 Cal. App.3d 846, 853, 82 Cal.Rptr. 830 (1970).

"The basic principle underlying the tort of inducing breach of contract has been extended to impose liability for intentional interference with business relations or advantages which are merely prospective and ordinarily not the subject of an existing contract. The wrong consists of intentional and improper methods of diverting or taking business from another which are not within the privilege of fair competition." 5 Witkin, *Summary of California Law,* § 652 at 740 (9th ed.).

"The tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage. Thus while the elements of the two actions are similar, the existence of a legally binding contract is not a *sine qua non* to the maintenance of a suit based on the more inclusive wrong." *Buckaloo v. Johnson,* 14 Cal.3d 815, 122 Cal.Rptr. 745, 749, 537 P.2d 865, 869 (1975). "Where no breach of contract is shown the law recognizes a more extensive privilege to interfere with business relations than where breach appears." *Chapman,* 2 Cal.App.3d at 856, 82 Cal.Rptr. 830. The justification advanced is generally the right to conduct a business in competition with that of another. *Id.* at 855, 82 Cal.Rptr. 830. Thus, for a claim of interference with prospective economic advantage "there must, of course, be something more than bona fide competition. The cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it. As in the case of interference with contract, any manner of intentional invasion of the plaintiff's interest may be sufficient if the purpose is not a privileged one." 5 Witkin, § 652 at 741 (citation omitted).

Thus, knowledge and intent are essential elements of an intentional interference claim. *See Chapman,* 2 Cal.App.3d at 853, 82 Cal. Rptr. 830. Or, according to Witkin, "(a) [i]n an action for inducing breach of contract, the plaintiff must plead and prove that the defendant intended to induce a breach; and (b) in an action for intentional interference with prospective economic advantage, the plaintiff must plead and prove intentional acts designed to disrupt the relationship." 5 Witkin, § 653 at 742.

Here, Summit concedes that it cannot show that Victor had any knowledge of Summit's contract with ZMTW at the time Victor purchased the lathes. Thus, Summit cannot show that Victor intended to interfere with the contract. Accordingly, the district court properly dismissed Summit's claim for inten-

tional interference with contract.[4] The district court also found that Victor's "continued sales of its rightfully acquired lathes was neither improper nor an attempt to disrupt Summit's potential relationships." We agree. Victor rightfully acquired the lathes; therefore its efforts to market the lathes fall squarely within the privilege of competition.

AFFIRMED.

FERGUSON, Circuit Judge, concurring:

I concur in the majority opinion, but file this separate concurrence to the discussion of the alleged Lanham Act violation in Part II of the opinion.

I am of the opinion that the law in this circuit regarding the Lanham Act permits a more direct dismissal of Summit's claim of reverse palming off.

The contract between Summit and the Chinese manufacturer ZMTW, provides that Summit has the exclusive right to purchase the lathes manufactured by ZMTW based upon Summit's designs and specifications, or any lathes that were substantially the same except for lathes which ZMTW would sell only in the Chinese market and which would not be exported outside of China.

Victor purchased seven lathes from ZMTW for resale in the United States. At the time of the purchase, Victor had no knowledge of the contract between Summit and ZMTW, never misrepresented anything about the lathes, nor modified them in any way. Victor, however, applied its own label to the lathes it purchased. This label does not represent that Victor is the manufacturer or designer. J. McCarthy, Trademarks and Unfair Competition § 16:15 (2nd ed. 1984 and Supp.1991).

The design of the Summit lathes was neither patented nor copyrighted, and therefore, Victor has the right to copy them. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1963).

Summit, however, claims that it has a cause of action under 15 U.S.C. § 1125(a) (§ 43(a)) of the Lanham Trademark Act of 1946, based upon a theory of "reverse passing off."

The leading ninth circuit case on the subject is *Smith v. Montoro*, 648 F.2d 602 (9th Cir.1981). In *La Mothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1406 (9th Cir.1988), *Smith* was summarized as follows:

> We began our analysis in *Smith* by defining "passing off" as the practice of selling one person's product or service under the name or mark of another. *Id.* Passing off may be either "express" or "implied." *Id.* Express passing off occurs when a business labels its goods or services with a mark identical to that of another enterprise, or otherwise expressly misrepresents the origin of the goods or services. *Id.* Implied passing off involves the use of a competitor's advertising material, or a sample or photograph of the competitor's product, to impliedly represent that the product being sold is made by the competitor. *Id.*

> In *Smith*, we further explained that section 43(a) also encompasses merchandising "practices or conduct 'economically equivalent' to palming off." *Id.* at 605. Among those practices is "reverse passing off," which may be either "express" or "implied." Express reverse passing off is "accomplished ... when the wrongdoer removes the name or trademark on another party's product and sells that product under a name chosen by the wrongdoer." *Id.* Implied reverse passing off is accomplished simply be removing or obliterating the name of the source and then selling the product in an unbranded state. *Id.*

In this case, at no time did Victor do anything with regard to the lathes it purchased from ZMTW that constituted a reverse palming off violation of the Lanham

---

4. Moreover, Summit's intentional interference with contract claim must fail based on the district court's determination that the lathes were substantially different. According to Summit's own characterization of its agreement with ZMTW, only lathes that were manufactured in accordance with Summit's designs and specifications, or are "substantially the same," are subject to their agreement.

Act. Victor did not remove nor obliterate Summit's name or mark from the lathes.