**HOOPLA SPORTS AND ENTERTAINMENT, INC., Plaintiff,**

v.

**NIKE, INC. and Columbia Broadcasting Systems, Defendants.**

**No. 96 C 1642.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 19, 1996.

Thomas William Flannigan, Law Office of Thomas Flannigan, Chicago, IL, Edward J. Moran, Chicago, IL, David Peter Cudnowski, David Cudnowski, Ltd., Chicago, IL, for Hoopla Sports and Entertainment, Inc.

Bart Allen Lazar, Alan S. Dalinka, Michael Levinson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Nike, Inc. and Columbia Broadcasting Systems.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Hoopla Sports and Entertainment, Inc. sues defendants Nike, Inc. and Columbia Broadcasting Systems ("CBS"), claiming that they wrongfully usurped his creation, a "U.S. versus the world" basketball game involving all-star teams of high school age boys. Hoopla seeks $2,000,000 in compensatory damages and punitive damages for trademark infringement, copyright infringement, breach of contract, intentional interference with prospective economic advantage, violations of the Illinois Deceptive Business Practices Act, and fraud. The defendants' motion to dismiss the complaint is presently before the Court. For the reasons that follow, the motion is granted.

### RELEVANT FACTS

The following recital of facts is drawn from the allegations of the complaint and its exhibits, which we take as true when considering a motion to dismiss. *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir.1996). John

Walsh, President of Hoopla, conceived of the idea to stage a "U.S. versus the world" basketball game involving all-star teams of high school age boys, ultimately titled the "Father Liberty Game" (FLG).[1] Although all-star games, international "U.S. versus the world" games, and high school age basketball games had all been played before, this was the first time all of these elements had been combined into one event. The theme of the event was international peace and freedom, and a special feature of the game was the involvement of players from different ethnic areas in the former Yugoslavia, to promote understanding among these individuals and direct attention to the war in Bosnia.

The proposed game was described in an Event Profile bearing the title "1994 Father Liberty Game™." *See* Compl. Ex. 2. The Event Profile generally described the FLG, which was to be played on June 18, 1994 on the eve of Father's Day, noting that the game was being played to promote international peace and freedom, with special recognition for the contributions of the men and women of the armed services toward those goals. The Event Profile also listed the tentative line-up of the U.S. team ("Team Liberty USA") and the international team ("Nations United For Peace"). The Event Profile expressed the hope that the game would become an annual event. The second and third pages of the Event Profile bore the notation "©1994 John Walsh ALL RIGHTS RESERVED" on the bottom of each page.

Walsh first contacted a representative of the United States Army in Germany in October 1993 about staging the FLG. Walsh faxed an Event Profile to the Army in January 1994. Meanwhile, Walsh continued with preparations for the game, contacting international and American players and coaches to request their participation. On March 18, 1994, Walsh sent a letter to Rich Sheubrooks, the Sports Marketing Director for defendant Nike, soliciting Nike's sponsorship for the FLG and enclosing a copy of the Event Profile. *Id.* Ex. 3. The letter described the current status of Walsh's efforts to recruit various all-star-level high school players, and stated, "We have attempted to keep the an-

nouncement secretive until all arrangements have been finalized and sponsors selected. However I have already received calls from USA Today and several television producers about this event." The letter explained that "As you will not be putting on the all-star game in Chicago this year, I thought you might be interested," and asked Sheubrooks to "look it over and call me with any questions." The letter concluded, "I wanted to bring it to your attention first. If you are not interested then please advise me so I can make other arrangements." *Id.* The letter did not directly describe what was being asked of Nike. Although it appears from its tone that the letter may not have been the first communication between Walsh and Nike, no prior communications appear in the complaint.

About May 8, 1994, Walsh was notified by the Army that it could not stage the FLG. Walsh immediately decided to stage the game in Chicago under other sponsorship. Walsh solicited corporate sponsorship for the FLG in Chicago by writing letters to many companies, including Kodak Company and Lufthansa Airlines. Walsh wrote a second time to Nike on May 26, again enclosing a copy of the Event Profile and "a description of sponsorship opportunities." *Id.* Ex. 5. The letter concluded, "Steve, please review this proposal and call John Walsh ... if you have any questions or Nike, Inc. has any interest in this unique opportunity." *Id.*

Nike agreed to sponsor the June 1994 FLG, and provided uniforms for both teams. Hoopla alleges that Nike also agreed to sponsor the FLG the following year, and on a yearly basis after that. Hoopla notes that the FLG was "granted sanction" by U.S.A. Basketball, "a not for profit corporation that purports to regulate some aspects of basketball" in this country. Compl. ¶ 23.

The FLG took place on June 18, 1994 at Alumni Hall at DePaul University in Chicago. Walsh put considerable effort as well as funds of his own into staging the FLG. After the conclusion of the FLG, Walsh began making preparations for the second annual FLG. These preparations ended when

---

**1.** Walsh has assigned all his rights and interests in the FLG to Hoopla.

Walsh learned that Nike was planning to stage a nearly exact replica of the FLG in Springfield, Massachusetts on May 13, 1995, to be known as the Nike Hall of Fame Hoop Summit ("Hoop Summit"). Hoopla's attorneys wrote Nike, noting that "Mr. Walsh brought the game to Nike for sponsorship," and that he "has invested thousands of hours of hard work and tens of thousands of dollars and his reputation as a promoter in high school basketball tournaments developing the Father Liberty Game.... The event profile of the ... Hoop Summit smacks of misappropriation, tortious interference and breach of an implied contract by Nike." Compl. Ex. 10.

On May 13, 1995, CBS broadcast the Hoop Summit. During the broadcast, CBS, through its play-by-play announcing and its color commentary and through an interview of one of the Hoop Summit coaches, made certain statements:

> For the *first time ever* U.S. Basketball has fielded a team of 12 high school All-Americans and today they'll take on a team of international young stars representing 10 different countries from 5 continents.

> Well, *it is the first time ever* that the United States has put together a select team for this level of competition which I think is great. We have the Dream Team coming up in Atlanta and now we have this in the under 19 age group.

> In my personal recollection, I can never remember anything like this having been done before.

Compl. ¶¶ 37–39 (emphasis supplied). Hoopla alleges that these statements were false, as the event was in fact an identical copy of the FLG, down to the theme of international peace and the game's particular focus on Bosnia, including the participation of players from different Bosnian ethnic backgrounds. Nike and CBS planned to, and did, stage a second annual game in April, 1996, known as the "Nike–Naismith Hoop Summit."

Hoopla brought suit against Nike and CBS on March 22, 1996, alleging a variety of claims against them. The defendants have moved to dismiss all claims.

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir.1989). When considering a motion to dismiss, the court views all facts alleged in the complaint, as well as any inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957). In short, the only question is "whether relief is possible under any set of facts that could be established consistent with the allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992) (citing *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–02).

## ANALYSIS

### I. TRADEMARK INFRINGEMENT

Count I asserts that Nike and CBS infringed the Father Liberty Game trademark in violation of section 43(a) of the Lanham Act by holding and promoting the nearly identical Hoop Summit. Hoopla does not argue that defendants infringed its trademark by using the "Father Liberty Game" mark without authorization. Defendants never attached or used that mark in association with the 1995 game called the Hoop Summit. Rather, Hoopla's trademark claim asserts that the defendants took Hoopla's *product*, the international high school age all-star basketball game it created in 1994, removed the trademark "Father Liberty Game," and presented the game to the basketball-consuming public as their own creation.

This theory, which has been variously referred to as "reverse passing off," "reverse palming off," "rebranding," and the like, is a recognized variant of the "false designation of origin" prohibited by § 43(a) of the Lanham Act. The relevant portion of that section states:

(1) Any person who, on or in connection with any goods or services, ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■ Reverse passing off "occurs 'when a person removes or obliterates the original trademark, without authorization, before re-selling goods produced by someone else.'" *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1203 n. 1 (7th Cir.1990) (quoting *Smith v. Montoro*, 648 F.2d 602, 605 (9th Cir.1981)). The concept of reverse passing off may also cover situations in which the defendant markets a product directly derived from the plaintiff's product but mislabeled to mask the product's origin. *See Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1241–42 (8th Cir.1994) (corn seed seller's marketing of seed derived from competitor's genetic material as its own was reverse palming off); *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1437 (9th Cir.1993) (one who sells "another's product that has been modified slightly and then labeled with a different name" may be guilty of reverse palming off) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990)).

■ While both traditional palming off and reverse palming off involve the misappropriation of another's talents, "the gravamen of the harm in a reverse palming [off] case is that 'the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the

satisfactory product.'" *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 241 (S.D.N.Y.) (quoting *Smith v. Montoro*, 648 F.2d at 607), *aff'd without op.*, 923 F.2d 845 (2d Cir.1990); *see also Waldman Pub'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 781 (2d Cir.1994) (Lanham Act section prohibiting false designation of origin is aimed at misrepresentation of credit properly belonging to the original creator of a work); *Cleary v. News Corp.*, 30 F.3d 1255, 1260 (9th Cir.1994) (reverse passing off "occurs when a product is mislabeled to mask the creator's contribution").

■ A claim of reverse passing off has three elements: (1) the defendant used a false designation of origin, or a false description or representation, in connection with goods or services; (2) the defendant caused the goods or services to enter interstate commerce; and (3) the plaintiff is a person "who believes that he or she [is or] is likely to be damaged as a result thereof." *Web Printing*, 906 F.2d at 1204 (quoting § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)). The defendants here argue that Hoopla has not made out a claim for reverse passing off because the FLG is not a "good" or "service" produced by Hoopla and resold under another name. The defendants also argue that the mere use of the "Father Liberty Game" trademark in connection with the 1994 game produced by Hoopla does not give Hoopla a monopoly over the production of all similar games in the future. It is the second argument that we find persuasive here.

*The 1994 FLG*

■ Hoopla/Walsh has created two things: an idea for an international all-star high school boys' basketball game, and the 1994 incarnation of that idea, trademarked under the name "Father Liberty Game." We reject the defendants' argument that the latter of these, the 1994 athletic event itself, was not a "good" or "service" within the meaning of the Lanham Act. They have directed us to no law supporting that argument, nor can we find any: what case law exists undermines their argument. *See generally San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (implying

that the Olympic games are a protectible good or service within the meaning of the Lanham Act). By the same token, however, if the 1994 FLG event was a "good" produced by Hoopla, the 1995 Hoop Summit event was a "good" created by the defendants. Hoopla/Walsh expended no efforts on behalf of the 1995 game staged by Nike and CBS. Indeed, the complaint does not allege that Hoopla/Walsh had any involvement in the production of that event. Thus, the thing that was taken by the defendants was Hoopla's idea for the event, not the labors involved with realizing that idea in the form of a particular game.[2]

### The Idea for This Type of Game

█ We agree with the defendants that while a trademark can protect a *product* from misappropriation under the Lanham Act, it cannot protect the *idea* behind that product from being used by others. *See Anti–Monopoly, Inc. v. General Mills Fun Group, Inc.,* 611 F.2d 296, 300 (9th Cir.1979) ("Trademarks are not properly used ... to further or perpetuate product monopolies."); *see also Sports Design & Dev., Inc. v. Schoneboom,* 871 F.Supp. 1158, 1160 n. 2 (N.D.Iowa 1995) ("trademark is a distinctive mark of authenticity" through which *products* of particular manufacturers or authors may be distinguished from those of others); *Fila USA, Inc. v. Kim,* 884 F.Supp. 491, 493 (S.D.Fla.1995) (a trademark identifies a particular *product* as coming from a particular source). "A trademark cannot be used to protect a mere concept or idea for a product." *Parham v. Pepsico, Inc.,* 927 F.Supp. 177, 179 (E.D.N.C.1995) (citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 907 (7th Cir.1983)), *aff'd without op.,* 86 F.3d 1151 (4th Cir.1996). Because Hoopla's "Father Liberty Game" trademark cannot protect the idea behind the game, and there are no allegations that defendants misappropriated more than the idea itself (as opposed to

Hoopla/Walsh's labors, goodwill, etc.), we dismiss Count I of the complaint.

## II. COPYRIGHT INFRINGEMENT

### A. U.S. Copyright Infringement Claim

Count II of Hoopla's complaint is a claim for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.* (1994). Hoopla asserts a copyright in the Event Profile, which states at the bottom of the second and third pages, "©1994 John Walsh ALL RIGHTS RESERVED." The complaint alleges that Nike received at least one copy of the Event Profile during Walsh's attempt to solicit Nike as a sponsor of the FLG.

Hoopla also appears to assert a copyright interest in the FLG itself. *See* Compl. ¶ 54 ("The copyright for the FLG involved an original work, a sports event that had never been held anywhere in the world prior to Walsh's conception of the work."). Hoopla alleges that both Nike and CBS had access to the "original work of the FLG," *id.* ¶ 55, and that both copied the work by staging and promoting the Hoop Summit. We address this latter claim first.

### Rights in the 1994 FLG

A claim of copyright infringement has two elements: ownership of a valid copyright in a work, and impermissible copying of the original elements of the protected work. *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295, 113 L.Ed.2d 358 (1991). Where copying cannot be shown directly, it may be shown indirectly through circumstantial evidence that (1) the claimed infringer had access to the protected work, and (2) the allegedly infringing work is substantially similar to the protected work. *Selle v. Gibb,* 741 F.2d 896, 901 (7th Cir.1984).

█ The difficulty with Hoopla's copyright claim alleging infringement of the FLG is that Hoopla cannot assert a copyright in the FLG itself. It is beyond question that copy-

---

**2.** Our conclusion that Hoopla has not stated a claim for trademark infringement might be different if there were any allegations that in staging the 1995 game Nike or CBS traded on the goodwill created by Hoopla/Walsh's efforts in connection with the 1994 game. In that case, it might be possible to read the complaint as alleging that the defendants indeed took credit for another's labors in order to advance their own competing product. There are no such allegations in the present complaint, however.

right may not be used to protect ideas, only particular expressions of ideas. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work ... extend to any idea, ... concept, principle, or discovery, regardless of the form in which it is described...."). Thus, the *idea* for the FLG is not protectible through copyright.

█ Nor can Hoopla claim ownership of a valid copyright in the sporting event that was the 1994 FLG. First, it is doubtful whether a sports event is a copyrightable work. To the extent that courts have considered the question, most courts have concluded that a sports game itself (as opposed to a broadcast of the game [3]) is not copyrightable. *See, e.g. National Basketball Ass'n v. Sports Team Analysis & Tracking Sys., Inc.*, 931 F.Supp. 1124, 1142–45 (S.D.N.Y.1996) (analyzing a number of sources including NIMMER ON COPYRIGHT and the legislative history of the Copyright Act, and concluding that an NBA game, as distinct from the broadcast of it, is not copyrightable), *amended and superseded on other grounds by* 939 F.Supp. 1071, 1074 n. 1 (S.D.N.Y.1996); 1 MELVILLE B. NIMMER, NIMMER ON COPYRIGHT § 2.09[F] (1996) (discussing problems that could arise if athletic events themselves were treated as copyrightable). *But cf. Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 669 n. 7 (7th Cir.1986) (baseball players' performances "possess the modest creativity required for copyrightability"). The Copyright Act defines "works of authorship" as including literary works; musical works; dramatic works; pantomimes and choreographic works; pictorial, graphic and sculptural works; motion pictures and other audiovisual works; sound recordings; and architectural works. 17 U.S.C. § 102(a). "Noticeably absent from this illustrative list of works of authorship, however, is a category for sports events or other analogous organized events." *National Basketball Ass'n*, 931 F.Supp. at 1143.

Courts have also held that "games" themselves (as opposed to the cards, boards, instruction books, etc. with which games may be played) are not copyrightable. *See Anti–Monopoly, Inc. v. General Mills Fun Group, Inc.*, 611 F.2d 296, 300 n. 1 (9th Cir.1979) (game concept cannot be copyrighted); *Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir.1975) (games that are in the public domain, and the rules to those games, are not copyrightable). Thus, the methods or rules of playing basketball games are not generally copyrightable. *See* 1 NIMMER ON COPYRIGHT § 2.18[H][3] ("no copyright may be obtained in the system or manner of playing a game or engaging in any other sporting or like activity"). Hoopla has provided no reason why this particular basketball game, the FLG, should be treated differently.

█ Second, even if basketball games were copyrightable, Hoopla has not complied with the necessary requisites to copyright the FLG. It is a requirement of the Copyright Act that the expression must be fixed in a tangible medium before it can be copyrighted. *See* 17 U.S.C. § 102(a) ("Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression."). This is not merely a statutory requirement of the Copyright Act, but is required by the text of the Constitution itself, which protects only "writings," i.e., tangible forms of expression. *See* 1 NIMMER ON COPYRIGHT § 2.03[B]. Hoopla nowhere alleges that the FLG was recorded or otherwise "fixed in any tangible medium of expression." [4] Thus, even leaving aside the

---

**3.** There is no doubt that broadcasts of sports events (or any other broadcast) may be copyrightable if the event is also recorded. *See* 17 U.S.C. § 101 (definition of "fixed" includes a "work consisting of sounds, images, or both, that are being transmitted" if a recording of the event is made simultaneously with the transmission); *National Ass'n of Broadcasters v. Copyright Royalty Tribunal*, 675 F.2d 367, 378 (D.C.Cir.1982) (creative contributions made by television cameramen, editors, etc. to a sports broadcast are protectible by copyright); *Baltimore Orioles*, 805

F.2d at 669 n. 7 (same). *Cf. Easter Seal Soc'y for Crippled Children and Adults v. Playboy Enters.*, 815 F.2d 323, 336–37 (5th Cir.1987) (videotape of live music session recorded by a public television station was work of joint authorship by performers and television crew).

**4.** In ¶¶ 52–53 of the complaint, Hoopla alleges that the *Event Profile*, but not the FLG itself, was fixed in a tangible form and was properly registered with the U.S. Copyright Office.

question of whether sports events fall within the protection of the Copyright Act, the Court finds as a matter of law that Hoopla does not possess a copyright under the Copyright Act in the FLG itself.

### Rights in the Event Profile

 Hoopla has also alleged that it held a valid copyright in the Event Profile. Hoopla's claim that its copyright in the Event Profile was infringed is deficient as well, however. This claim falters on the second requirement for pleading infringement, impermissible copying. Hoopla has not alleged that the defendants copied the Event Profile. Instead, both the language of the complaint and the gist of Hoopla's claim are to the effect that the defendants copied the *FLG*.

As discussed above, Hoopla owns no valid copyright in the FLG itself, and so the athletic event that was the FLG cannot be the subject of a copyright claim. And the copying of the *FLG* will not support a claim that the *Event Profile* was impermissibly copied.

The gist of Hoopla's complaint is that the defendants' copying of the FLG shows that the Event Profile was indeed "copied" within the meaning of the Copyright Act. Hoopla provides no support for this proposition, however, and fails to cite a single case holding that the recreation of an event described in a copyrighted promotional document infringes the copyright of that document. As we can find no case law suggesting that Hoopla has adequately alleged the copying of the *Event Profile,* we dismiss Count II's claim of domestic copyright infringement.

### B. Berne Convention Copyright Claim

Count III of the complaint is based on violations of the Berne Convention for the Protection of Literary and Artistic Works, an international treaty addressing copyrights. The United States acceded to the Berne Convention via the Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853.

 The Berne Convention does not create a separate copyright cause of action, however. Section 104(c) of the Copyright Act makes clear that the Berne Convention provides no greater or lesser protection for copyright than the Copyright Act itself:

> Effect of the Berne Convention.—No right or interest in a work eligible for protection under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto. Any rights in a work eligible for protection under this title that derive from this title, other Federal or State statutes, or the common law, shall not be expanded or reduced by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto.

17 U.S.C. § 104(c). Thus, the Berne Convention cannot be used to support a separate copyright claim.

 Hoopla explains that it has alleged this nonexistent claim as a fallback in the event that the defendants "are able to successfully challenge the validity of Plaintiff's copyright registrations." Pl.Resp. to Def. Mot. Dismiss at 8. Under the Berne Convention, foreign nationals are permitted to file copyright infringement actions without the necessity of showing that the copyright has been properly registered. United States citizens must still comply with the registration requirement, however. Hoopla asserts that this distinction violates the Equal Protection Clause of the Fourteenth Amendment.

Hoopla has no standing to challenge the constitutionality of the Berne Convention Implementation Act now, however. Hoopla alleges that it has properly registered its copyright in the Event Profile. Compl. ¶ 52. As Hoopla well knows, when considering a motion to dismiss we take the allegations of the complaint as true. *Doherty v. City of Chicago,* 75 F.3d at 322. Because Hoopla asserts that it has registered its copyright, the nonregistration provisions of the Berne Convention are not relevant to this suit. Accordingly, the Court dismisses Count III.

### III. BREACH OF CONTRACT

Count IV of the complaint is a breach of contract claim against Nike only. The Court

finds that it is deficient for a multitude of reasons.

To plead a contract claim, a plaintiff must make allegations raising an inference that: (1) a contract with definite and certain terms existed between the parties; (2) the plaintiff performed its obligations under the contract; (3) the defendant breached its obligations under the contract; and (4) the plaintiff suffered damages as a result. *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.,* 818 F.Supp. 1152, 1155 (N.D.Ill.1993); *cf. Cleland v. Stadt,* 670 F.Supp. 814, 817 (N.D.Ill.1987) (plaintiff must allege formation of a contract, terms of that contract, performance by plaintiff, breach by defendant, and damages). Nike contends that Hoopla has failed to plead the essential terms of the contract, and it has also failed to plead that it performed its own obligations under that contract.[5]

We find that Nike's arguments are correct on both counts. The complaint indeed lacks sufficient allegations describing the terms of the alleged contract between Hoopla/Walsh and Nike. The complaint alleges that:

- Walsh solicited Nike's sponsorship of the FLG, sending Nike copies of the Event Profile. The Profile described only the proposed 1994 FLG, adding that, "It is our hope that the game will be played annually in different parts of the world." *See* Compl. ¶¶ 16, 21; Exs. 2, 3, 5.

- Nike agreed to sponsor the FLG in 1994 and provided uniforms for both teams for that game. *Id.* ¶ 21.

- "Walsh and Nike agreed that Nike would sponsor the FLG the following year, and on a yearly basis after that." *Id.* ¶ 22.

The allegations of ¶¶ 21–22 do describe at least some of Nike's obligations under the alleged agreement. The complaint is silent, however, as to other essential terms, such as the obligations owed by Hoopla/Walsh in return, the consideration for the agreement, the time and place of performance, the role of Walsh and/or Hoopla in future games, etc.

A complaint must set forth factual allegations that outline the essential elements of the claim, and legal conclusions lacking adequate support should not be considered. *See Benson v. Cady,* 761 F.2d 335, 338 (7th Cir.1985). Definite and certain terms of the contract are one element of a contract claim under Illinois law. *See Perez v. Abbott Labs.,* No. 94 C 4127, 1995 WL 86716 at *8 (N.D.Ill. Feb. 27, 1995) (citing *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 314, 113 Ill.Dec. 252, 256, 515 N.E.2d 61, 65 (1987)); *see also Cleland,* 670 F.Supp. at 817 (plaintiff must allege the terms of the contract).

In *Moore v. Fidelity Fin. Servs., Inc.,* 869 F.Supp. 557 (N.D.Ill.1994), the defendant moved for a more definite statement of a contract claim. The court there stated that, to meet the notice pleading standards of Rule 8(a), a contract claim must identify "[1] the relevant agreement, [2] the basic contents of that agreement, and [3] the pertinent parties." *Id.* at 560–61 (citations omitted); *accord Khalid Bin Talal Bin Abdul Azaiz Al Seoud v. E.F. Hutton & Co., Inc.,* 720 F.Supp. 671, 685 (N.D.Ill.1989). In this case, because there is insufficient description of the contract terms, the second require-

---

5. Nike also argues that this claim is barred by the Statute of Frauds. As we find that Hoopla's contract claim fails on other grounds, we do not reach this argument. We note that it presents another possible ground for dismissal, however, at least with regard to Nike's alleged agreement to sponsor the FLG "the following year, and on a yearly basis after that." Compl. ¶ 22. The plaintiff argues that it is inappropriate to consider affirmative defenses before it has had an opportunity to conduct discovery. We agree with our colleague Judge Williams that "[g]enerally, an affirmative defense will not support a motion to dismiss under Rule 12(b)(6)." *Smith v. Orkin Exterminating Co., Inc.,* No. 87 C 4787, 1987 WL 17481 at *1 (N.D.Ill. Sept. 22, 1987) (citing *Quiller v. Barclays American/Credit Inc.,* 727 F.2d 1067, 1069 (11th Cir.1984) and *Scott v. Kuhlmann,* 746 F.2d 1377, 1378 (9th Cir.1984)). "Nevertheless, a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Quiller,* 727 F.2d at 1069. Here, paragraph 22 clearly alleges the existence of a contract that is not capable of performance within a year, and the complaint does not identify any signed writing that would comply with the requirements of the Statute of Frauds.

ment—the contents of the alleged agreement—is missing.

■ Even if this were not sufficient reason to dismiss the contract claim, the claim is also deficient for another reason: it fails to allege that Hoopla performed its obligations under the contract and any conditions precedent. As noted above, such an allegation is an essential element of a contract claim. *Bercoon, Weiner, Glick & Brook,* 818 F.Supp. at 1155; *Cleland,* 670 F.Supp. at 817; *see also Redfield v. Continental Cas. Corp.,* 818 F.2d 596, 610 (7th Cir.1987) (allegation that the plaintiff performed all contractual conditions required of him is an essential element of a contract claim). Although Rule 9(c) permits a plaintiff "to aver generally that all conditions precedent have been performed or have occurred," FED.R.CIV.P. 9(c), even this liberal standard has not been met here. The complaint alleges that Walsh/Hoopla staged the 1994 FLG, but there is no indication that this in itself fulfilled the plaintiff's obligations or met the conditions precedent under the alleged contract. Indeed, as noted above, there is nothing in the complaint that even tells us what the plaintiff's obligations were, or that would allow us to infer that staging the FLG was part of them. For all of the foregoing reasons, the Court finds that Count IV fails to state a claim, and dismisses it accordingly.

## IV. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Count V is a claim for intentional interference with prospective economic advantage, based on allegations that the defendants' staging of the 1995 Hoop Summit interfered with Hoopla's expectations of some type of business relationship with potential FLG sponsors Kodak and Lufthansa. *See* Compl. ¶¶ 19, 71–73. As with the contract claim in Count IV, the Court finds Count V to be deficient in several ways.

■ The Illinois Supreme Court has recently outlined the elements of the tort of intentional interference with prospective economic advantage: "(1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) an intentional and unjustified interference by defendant that induced or caused a breach or termination of expectancy; and (4) damage to the plaintiff resulting from the defendants' interference." *Anderson v. Vanden Dorpel,* 172 Ill.2d 399, 406–07, 217 Ill.Dec. 720, 723, 667 N.E.2d 1296, 1299 (1996). We find that Hoopla has not pled either the first or third elements.

■ The clearest problem is Hoopla's failure to adequately plead that Nike and CBS staged the Hoop Summit with the intention of interfering with Hoopla's relationships with possible FLG sponsors such as Kodak and Lufthansa. Nothing in the complaint supports the inference that Nike and CBS were specifically targeting Hoopla's expectancies (to the extent that there were any, *see infra*) with Kodak and Lufthansa.[6] The plaintiff " 'must allege facts which indicate that the defendants acted with the purpose of injuring plaintiff's expectancies.' " *Kemmerer v. John D. & Catherine T. MacArthur Found.,* 594 F.Supp. 121, 123 (N.D.Ill.1984) (quoting *Crinkley v. Dow Jones & Co.,* 67 Ill.App.3d 869, 880, 24 Ill.Dec. 573, 581, 385 N.E.2d 714, 722 (1st Dist.1978)). Moreover, "the defendant[s'] interference must be between the plaintiff and a third party." *Eisenbach v. Esformes,* 221 Ill.App.3d 440, 444, 163 Ill.Dec. 930, 933, 582 N.E.2d 196, 199 (2d Dist.1991). Thus, the plaintiff must allege "some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective [economic] relationship with plaintiff." *McIntosh v. Magna Sys., Inc.,* 539 F.Supp. 1185, 1193 (N.D.Ill.1982). Because Hoopla has not done so here, its claim must fail.

---

**6.** The complaint states only that the defendants knew of the expectancies with Kodak, Lufthansa, and unspecified others, and that: "Nike intentionally interfered with the prospective economic advantage between Hoopla and [those companies], by staging the Hoop Summit, making it impossible for Hoopla to stage and benefit from sponsorship for the FLG." Compl. ¶ 73. The Court also notes that, as this allegation names only Nike, no claim against CBS under this count is stated.

It is also dubious whether Hoopla has adequately alleged that it had a valid business expectancy with Lufthansa and Kodak. Hoopla alleges generally that it had such an expectancy. Compl. ¶ 71. However, ¶ 19 of the complaint (the only specific allegation on this subject) states only that "Walsh solicited corporate sponsorship ... by writing letters." It is well established that, although a plaintiff usually may rely on general allegations, where a plaintiff pleads particulars, and they show he has no claim, then he has pled himself out of court. *Thomas v. Farley,* 31 F.3d 557, 558 (7th Cir.1994) (citations omitted). In those cases, the specific allegation will control over the general. *Id.*

In *Vanden Dorpel,* the Illinois Supreme Court held that, although a plaintiff need not allege that it had a firm offer in hand prior to the alleged interference, mere allegations that the plaintiff was involved in the process of negotiations with a third party were insufficient to state a claim. *Id.,* 172 Ill.2d at 407–08, 217 Ill.Dec. at 723, 667 N.E.2d at 1299. "The hope of receiving a[n] ... offer is not a sufficient expectancy." *Id.,* 172 Ill.2d at 408, 217 Ill.Dec. at 723, 667 N.E.2d at 1299. Hoopla has simply alleged that it was seeking sponsorship from various companies. This is insufficient to adequately allege that Hoopla had a viable business relationship with the companies it names in the complaint.

As Hoopla has not adequately alleged either valid business expectancies or action taken by the defendants directed toward those expectancies, it has failed to state a cause of action for intentional interference with prospective economic advantage, and Count V must be dismissed.

## V. ILLINOIS DECEPTIVE TRADE PRACTICES ACT

The defendants have moved to dismiss Count VI, a claim under the Illinois Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.,* on the grounds that the monetary relief sought in that count is not available under that statute. Hoopla concedes that their argument is correct, and has indicated a desire to amend its complaint to allege instead a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,

815 ILCS § 505/1 *et seq.* The Court dismisses Count VI of the complaint.

## VI. FRAUD

The final claim raised by Hoopla is a claim of common law fraud (Count VII). In order to state a cause of action for fraud, a plaintiff must allege: "(1) [a] false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980).

Hoopla alleges that the defendants' false statements involved representations that the 1995 Hoop Summit was the first game of its kind, when actually that distinction belongs to Hoopla's own game, the 1994 FLG. Hoopla's allegations do not meet the requirements for pleading fraud, however. The complaint alleges neither that Nike or CBS made the alleged misrepresentations for the purpose of causing Hoopla to act, nor that Hoopla relied on those misrepresentations. Rather, the complaint alleges that the defendants intended to deceive the *public,* and that the *public* indeed relied upon the defendants' statements, but that it was *Hoopla* that was injured as a result of this reliance. The cause of action for common law fraud in Illinois does not encompass an action in which A makes misrepresentations to B, but it is C (a business competitor of A's) that is injured. *See generally Caplan v. International Fidelity Ins. Co.,* 885 F.Supp. 175, 179 (N.D.Ill.1995) (where the complaint shows that the plaintiff did not rely on the alleged misrepresentation, the plaintiff cannot bring a fraud claim); *Fink v. DeClassis,* 745 F.Supp. 509, 513 (N.D.Ill.1990) (dismissing fraud claim where plaintiff did not allege the defendant's intent to cause plaintiff to act); *Derson Group, Ltd. v. Right Management Consultants, Inc.,* 683 F.Supp. 1224, 1231 (N.D.Ill.1988) (dismissing fraud claim where plaintiff could not allege that defendants' misstatements had caused it to take some affirmative action); *cf. Latigo Ventures v. Laventhol & Horwath,* 876 F.2d 1322, 1326

(7th Cir.1989) ("Where misrepresentations are made but not relied on directly or indirectly ..., a plaintiff in a fraud case cannot show that he was harmed by them."). "What defendant[s] allegedly did may be actionable as another kind of tort, but it was not common law fraud." *Caplan*, 885 F.Supp. at 179. The Court accordingly dismisses Count VII.

## CONCLUSION

For all of the foregoing reasons, the Court grants the defendants' motion to dismiss. If the plaintiff desires to file an amended complaint that is consistent with this opinion and with plaintiff's counsel's responsibilities pursuant to Federal Rule of Civil Procedure 11, it must move for leave to do so on or before December 31, 1996, attaching a draft of the amended complaint. The Court will scrutinize any such proposed amended complaint carefully.